PENINSULAR IRON CO. et al. v. EELLS et al.

(Circuit Court of Appeals, Eighth Circuit.  May 6, 1895.)

No. 406.

1 LIEN—ADVANCES FOR PURCHASE OF RAILROAD.

In 1875, complainants, who owned bonds of a railroad which was about to be sold under foreclosure, entered into an agreement with other bondholders and lienholders by which one S. was appointed their agent to buy the road; complainants and their associates to furnish the amount of the price, in bonds, liens, and cash.  S. accordingly bid in the road, and the amount of cash to be paid was fixed by the court.  Shortly before the day for its payment, S. made a contract with complainants, reciting that they desired to borrow the amount of cash required from them, and agreeing that he would convey the road to the K. Ry. Co., a corporation to be organized, and would cause that company to mortgage the property to one E. to secure $600,000 in notes, an amount of which equal to the cash furnished by complainants should be held by E. as security for the repayment of such cash.  Complainants furnished the cash required, which was but a small part of that called for in the purchase, the balance being furnished by S. and his associates.  S. bought the road.  The K. Ry. Co. was organized, and S. conveyed the road to it, upon an agreement that it should issue the $600,000 notes and secure them by a mortgage to E., and should issue $2,700,000 bonds, also secured by a mortgage to E., which should be first used to pay off the notes; that the notes and bonds should be deposited with E., as trustee, and disposed of as S. should direct, and the proceeds be used by S. in the completion of the road.  The K. Ry. Co. made the notes, and secured them by mortgage, and it appointed S. its

financial agent, and ratified all that he had done. Soon after, by direction of S., the notes, none of which had ever been used, and the mortgage securing them, were canceled, and the bonds and mortgage for $2,700,000 were made. S. having difficulty in raising the money to complete the road by the use of the bonds, and having expended a large amount of money in building it, and differences having arisen between the parties interested, as to their interests, S. brought a suit in an Iowa state court, to which complainants and all others interested in the property were parties, and appeared and litigated the questions arising, in which suit all the facts relating to the property and the dealings of the parties with it were set out, and in which the court made a decree settling and adjusting the rights of all the parties, and adjudging, among other things, that the complainants and others in like situation should receive their proper proportions, which were ascertained and fixed, of the stock of the K. Ry. Co., in return for their contributions to its purchase. Complainants received such stock, and no appeal was taken from the decree. Subsequently, in order to get money to complete the road, S., pursuant to a resolution of the board of directors of the K. Ry. Co., offered to the stockholders, including complainants, an opportunity to buy an amount of the bonds of the company proportioned to their stock, at 50 per cent. of their par value, which was estimated to be sufficient to pay the debts of the company and finish the road. Complainants declined, and S. and his associates purchased all the bonds, but at a higher price, and the debts were paid, and the road finished. Afterwards, the C. Ry. Co. purchased the bonds from S. and his associates, for value, relying on the validity of the mortgage securing them. The K. Ry. Co. defaulted in payment of interest on the bonds, and the road was foreclosed and sold. Complainants, before the confirmation of the sale, brought this suit against the K. Ry. Co., S., the C. Ry. Co., and others interested in the property, to enjoin the confirmation and have themselves declared entitled to a lien, superior to the mortgage, on the road, for the share contributed by them to the purchase price on the original sale. They had previously brought another suit for the same purpose before the foreclosure, but after the sale of the bonds to the C. Ry. Co., which had been dismissed for want of jurisdiction. *Held*, that complainants acquired no lien on the road by virtue of their contract with S. for the issue of notes by the K. Ry. Co., and the holding of them as security, or by virtue of the subsequent dealings of S. or E. or others with the property.

2. SAME—RES ADJUDICATA.
   *Held*, further, that the decree of the Iowa court was res adjudicata as to any such lien, as well as all rights of complainants as against S. or his associates, or their privies.

3. JUDGMENTS—COLLATERAL ATTACK—FRAUD.
   *Held*, further, that in a collateral proceeding between the same parties the decree of the Iowa court would not be a less complete bar, if shown to have been procured by fraud or imposition.

4. RES JUDICATA.
   A judgment is conclusive upon the controversies determined thereby between the parties and their privies, and cannot be impeached for fraud otherwise than by a direct proceeding brought to set it aside on that ground.

5. TRUSTEE UNDER MORTGAGE—DUTIES.
   Until the bonds are sold or pledged, the trustee in a mortgage, made to secure them, is the agent of the maker of the bonds and mortgage only, and is bound to follow his directions.

Appeal from the Circuit Court of the United States for the Southern District of Iowa.

This was a suit by the Peninsular Iron Company and Abel Whitney, as trustee for himself and Walter S. Sears, Channing Whitney, William S. Wilcox, Porter L. Sword, the estate of Henry Hart, deceased, the estate of Charles Rynd, deceased, and for the Illinois

Manufacturing Company; Joseph S. Hart, administrator, and Jane S. Hart, administratrix, of the estate of Henry Hart; Adelia S. Angel; Joseph R. Bennett; S. Edson Graves; Henry S. Wilcox; George A. Wilcox; and Abel Whitney, against Dan. P. Eells; the St. Louis, Keokuk & Northwestern Railway Company; Andros B. Stone; the Chicago, Burlington & Quincy Railroad Company, and William Baldwin and C. F. Perkins, intervener, impleaded with Leander M. Hubby, Samuel M. Carpenter, and Charles Wasson, survivors of themselves and William F. Smith, copartners by the name of the Fulton Foundry Company; and the Bank of Skaneateles,— to set aside a decree of foreclosure, and establish and foreclose a lien on the road of the St. Louis, Keokuk & Northwestern Railway Company. The circuit court dismissed the bill. Complainants appeal. Affirmed.

For decision on a question of jurisdiction in a previous suit between the same parties, see 121 U. S. 631, 7 Sup. Ct. 1010.

Andrew Howell, H. Scott Howell, and William C. Howell, for appellants.

Jas. H. Anderson, Palmer Trimble, H. H. Trimble, and G. Edmunds, for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. This is an appeal from a decree dismissing a bill brought in September, 1887, by the appellants, the Peninsular Iron Company, a corporation, and others, to set aside the decree of foreclosure of a mortgage for $2,700,000 on the St. Louis, Keokuk & Northwestern Railway Company, rendered in the circuit court for the Southern district of Iowa on July 7, 1887, and to establish and foreclose a superior lien to that of the $2,700,000 mortgage upon the property of this railroad company. The facts out of which this controversy arises are substantially these:

On January 27, 1875, in the circuit court for the Eastern district of Missouri, a decree of foreclosure of two mortgages on the Mississippi Valley & Western Railway Company was rendered, which directed the sale of the property of that corporation to be made by a master on April 14, 1875. This railway company had constructed a railroad from Keokuk, Iowa, to Hannibal, Mo., and had expended a large amount of money towards its extension from Hannibal to Louisiana, a distance of 26 miles. This extension was, after the master's sale, completed by the Keokuk Company, which was formed by the purchasers, and the railroad was extended from Louisiana to Clarksville, 10 miles, and afterwards from thence to St. Peters, a distance of 43 miles, so that it ultimately became about 134 miles in length. On March 27, 1875, certain of the lienholders and bondholders of the Mississippi Valley Railway Company appointed one A. B. Stone their agent and trustee to purchase the property of the company at the foreclosure sale, and to hold or dispose of it as a majority in interest of those who made this appointment, and joined in the purchase through him, should direct. Those who joined in this purchase agreed with each other and with their agent, Stone,

that they would deliver to him all the bonds and liens upon this railway property that they held, and that each of them would pay to him in cash, to be used in the purchase of the property, such a proportion of the cash required to complete the purchase as his bonds and liens bore to, the aggregate amount of the bonds and liens received by Stone under the agreement. Under this agreement the appellants joined in the purchase, and furnished in bonds, at the value awarded to them by the court, and in cash, about 4 per cent. of the purchase price paid. They furnished $24,391.61, and the price paid by Stone was $606,830.28. The appellants were creditors of the Adrian Car & Manufacturing Company, of Adrian, Mich., and received the bonds they furnished to make this purchase from that company to secure debts it owed to them. Their bonds were part of 125 bonds that had been previously pledged by the railway company to the car company to secure a debt due from the former to the latter. At the time of this contract to purchase this railway property, these 125 bonds were held by parties in and about Adrian who joined in the purchase, and together furnished about 11 per cent. of the purchase price. These Adrian parties acted together throughout these transactions, and were actively represented by the appellant William S. Wilcox, and by W. H. Angel, husband of the appellant Adelia S. Angel. Pursuant to the agreement of March 27, 1875, Stone purchased the property on April 14, 1875, and the court required him to pay $296,463.08 of the purchase price in cash on or before June 17, 1875. On June 8, 1875, Stone signed, and delivered to the Adrian parties, a contract in which he recited that he had purchased the property of the railroad company at the foreclosure sale; that a majority in interest of the purchasers had directed him to convey it to the St. Louis, Keokuk & Northwestern Railway Company, a corporation to be formed by those interested in the purchase; that these Adrian parties were interested in the purchase, and were required to furnish before June 17, 1875, their ratable proportion of the cash required to complete it, which was estimated to be $30,844.12; that they desired to borrow the same, and that to enable them to do so he agreed to convey the property to the Keokuk Company, to cause that company to mortgage the property to Dan. P. Eells, as trustee, to secure notes to the amount of $600,000, to deposit those notes with Eells, and to have Eells hold such an amount of those notes as would equal the amount of cash which the Adrian parties should pay to him before June 17, 1875, as collateral security for the repayment of the money so paid by them to complete the purchase of the property. The Adrian parties furnished $30,844.12, and Stone and others interested in the purchase furnished $265,619.86, in money, to complete the purchase, and with this money, and the bonds and liens of the purchasers, Stone completed it, and obtained a conveyance of the property to himself. Immediately thereupon the Keokuk Company was organized by those interested in this purchase. Stone then sold and conveyed the property to that company on these, among other, terms: That the company should issue $600,000 of notes payable in two years, and should secure them by a mortgage; that it should

issue bonds to the amount of $2,700,000, payable in 30 years, and secure them by a mortgage; that the bonds should be used first to pay off and satisfy the mortgage for $600,000; that all these notes, bonds, and mortgages should be placed in the hands of Dan. P. Eells, trustee; that the notes and bonds should be sold and disposed of as Stone should direct; and that Stone should use the proceeds thereof in the construction of the railroad, until it was completed, and when the road was completed all the bonds and stocks should belong to him, but that until that time the bonds and notes should not be issued any faster than at the rate of $20,000 per mile of completed and equipped railroad. Pursuant to this contract, Stone conveyed the property to the Keokuk Company. On June 22, 1875, the Keokuk Company made and delivered to Eells, as trustee, notes amounting to $600,000, payable in two years, and secured them by a mortgage on the property. On August 10, 1875, the Keokuk Company appointed Stone its financial agent to sell and dispose of its bonds and notes, and ratified his prior contracts for their sale and disposition. The notes secured by the mortgage for $600,000 were never sold or used, and on November 10, 1875, by direction of Stone, they were canceled, and Eells delivered them back to the company, and released the mortgage which secured them. On the same day the company executed and delivered to Eells, as trustee, the 30-year bonds, amounting to $2,700,000, and a mortgage to secure them. Stone was unable to sell the bonds, and he proceeded to equip and operate the railroad, and to extend it towards St. Louis, on the credit of the bonds, which he pledged for materials and money to accomplish this purpose. In 1877 the road had been equipped and extended from Hannibal to Clarksville, a distance of 36 miles, through his exertions, at an expense of about $700,000, and $1,800,000 of the bonds had been pledged for this purpose.

Differences had arisen between the parties interested in the original purchase, as to their respective interests, and thereupon Stone brought a suit in the district court of Lee county, in the state of Iowa, against all the parties interested in the original purchase, including the appellants in this suit, and against all the parties to whom the Keokuk Company had become indebted, to determine the respective interests of these parties in the property, and to obtain his discharge as their trustee. In his petition he pleaded all the facts to which we have referred, except his agreement with the Adrian parties, of June 8, 1875, that such an amount of the notes secured by the mortgage for $600,000 as would equal the money they furnished towards the purchase should be held by Eells as collateral security for the repayment of the money to them. He expressly stated in his petition, however, that the notes and mortgage for $600,000 had been made; that they had not been used, and that the notes had been canceled; and that the mortgage had been discharged. He set forth in detail the amount of cash and the amount of bonds and liens which each of the purchasers had furnished to him to make the purchase, and the amount of expense incurred by him for the Keokuk Company in equipping and extending the railroad. He pleaded that, of the $2,700,000 of bonds, bonds to the

amount of $1,800,000 had been pledged for the payment of expenses of construction and equipment incurred since the purchase, and that the entire assets of the Keokuk Company stood pledged for this indebtedness, for the moneys paid into court by him upon the purchase, and for his charges for services and expenses, and that they must all be paid before the bonds and stocks could be divided between the owners. He prayed, among other things, that "the respective interests of each and all the parties in the property of the St. Louis, Keokuk & Northwestern Railway Company, and the other property purchased by your petitioner, as herein stated, be ascertained and determined by the court; that the moneys paid, as hereinbefore stated, upon said purchase, be refunded to the purchasers, or be so prorated as that each shall bear and pay his or its ratable portion thereof, and that the moneys expended and debts incurred in the construction, improvement, and repair of said road and for rolling stock, be paid: * * * and, finally, that this court direct the distribution of the assets of said St. Louis, Keokuk & Northwestern Railway Company remaining after all equities are adjusted between the parties to this suit, among the respective parties, according to their respective interests therein, and that your petitioner be discharged from further liability on account of his said trust."

On August 24, 1877, the appellant Wilcox verified an answer made by the assignees, of the Adrian Car Company in that suit, which admitted the truth of all the allegations of this petition that are material to the issues now under consideration, and claimed a preference in the payment of $22,830.66 due from the old Mississippi Valley Railway Company to the car company. One of the defendants in that suit brought a suit against Stone in the state of New York, and obtained an injunction which prohibited him from proceeding with the suit in Lee county, Iowa. Thereupon, on June 9, 1878, the assignees of the car company, one of whom was the appellant Wilcox, filed a cross bill in the court in Lee county, in which they set forth the amounts, in cash, bonds, and liens, paid by each of the original purchasers; alleged that each of them was entitled to share in the property of the Keokuk Company in the same proportion that the value of their securities and cash furnished bore to the whole purchase price; that their attorneys had charged them $5,000 for services in maintaining their lien against the old Mississippi Valley Railway Company, and that their fees should be paid out of the assets of the Keokuk Company before division; and prayed that the court "decree a division among the several claimants of the bonds, stocks, assets, and property of the railroad company in the hands of said railroad company [the Keokuk Company], or in the hands of Daniel P. Eells, trustee, as they severally may be found entitled; that they may be found to be the owners of the undivided one-ninth of all said property; and that the other claimants may be decreed their respective interests, so that the title and ownership of said property between the said parties may be found and settled by said decree." All the appellants in this case received and accepted service of a notice of the filing of this cross bill, and be-

came parties to the suit in the court in Lee county, and subject to the jurisdiction of that court, before that suit went to trial. At the trial of that suit, Wilcox and Angel were present and testified. Some of the Adrian parties at that trial defeated a claim made by Stone for several thousand dollars which he had expended, and which he asked to have refunded to him, and obtained the allowance of a claim for several thousand dollars upon a lien the assignees of the car company held, which was opposed by Stone. On September 9, 1878, the court in Lee county rendered a decree in that suit which determined that the Keokuk Company was liable to Stone for $514,177.45, and to others for $171,402.71, on account of the extension of the railroad to Clarksville, and its equipment; that all the bonds applicable to the 90 miles of railroad then constructed, to wit, $1,800,000 in amount, of the $2,700,000 secured by the mortgage, were pledged to secure these liabilities; and that each of the appellants, and all others who joined in the purchase under the master's sale of April 14, 1875, were the owners of such a proportion of the property of the Keokuk Company, subject to these liabilities and pledges, as the value of the bonds and liens and the cash each furnished to make the purchase bore to the entire purchase price. The fractional portion of this property to which each of these appellants was entitled was fixed in the decree, and the capital stock of the Keokuk Company was divided between the appellants and the other parties to that suit in accordance with the terms of this decree. The appellants received their respective shares of this stock, and no appeal has ever been taken from that decree, nor has it ever been modified.

After the decree was rendered, Stone was still unable to sell the bonds, and the road to Clarksville was unable to earn much more than its operating expenses; and thereupon, as the agent of the railroad company, he proceeded to extend it to St. Peters, so that it might have a connection with St. Louis. In January, 1879, it was estimated that money to the amount of 50 per cent. of the face of the bonds would pay the debts of the company, and complete the road to St. Peters. For this purpose, pursuant to a resolution of the board of directors of the railroad company, Stone offered to each of the appellants and to each of the other stockholders of the company, at 50 per cent. of their face value, such a proportion of the bonds of the company as their stock respectively bore to the entire capital stock of the company, on condition that, if any of them failed to purchase within 30 days, their shares of these bonds would be offered to other stockholders at the same rate, and, if not at the time bought, they would be sold at not less than that rate to any purchasers that could be found. The appellants declined to purchase any of the bonds, and Stone and others of the stockholders did purchase all of them but about 125, which the company had previously disposed of in the settlement of a claim of one Fallon. They paid for these bonds an amount sufficient to pay the debts of the company and to complete the road to St. Peters, and this amount was more than 50 per cent. of the face value of the bonds. On December 14, 1880, the appellee Perkins made a contract to purchase

from Stone and his associates, for the appellee the Chicago, Burlington & Quincy Railroad Company, a corporation, these bonds to the amount, in face value, of $2,585,000; and he subsequently bought of others, for the same company, bonds of the Keokuk Company to the amount of $114,000. Before he paid for any of these bonds he employed an attorney at law to examine their validity, and the security for them furnished by the mortgage. This attorney made an examination of the records of the Keokuk Company, and of the proceedings in the suit in the district court of Lee county, and reported to him that the bonds were authorized and valid, and were secured by a first mortgage of $2,700,000 on the property of the company. After receiving this report, Perkins paid for the bonds. There is a dispute in the testimony regarding the notice he had of the claims of the appellants. Default was made in the payment of the interest on these bonds, and on July 7, 1887, a decree of foreclosure of the mortgage securing them was rendered at the suit of the trustee, Eells, in the circuit court for the Southern district of Iowa, which declared that mortgage to be a first lien on the property of the Keokuk Company, and directed the sale thereof to pay the debts secured by the mortgage. The appellants filed their bill in this case in September 1887. They had in 1881 brought a like suit, in which their bill was dismissed on the merits in the circuit court; and in the supreme court of the United States the decree of the circuit court was reversed, and their suit was dismissed, for want of jurisdiction. 121 U. S. 631, 7 Sup. Ct. 1010. In the bill in the case now before us they alleged that they had a lien on the property of the Keokuk Company superior to that of the $2,700,000 mortgage, and they sought an injunction to restrain the confirmation of the sale under the decree of foreclosure of July 7, 1887. Instead of contesting the application for an injunction, the appellee Perkins filed a bond in this suit, conditioned that he would pay the amount for which the courts should finally decree that the appellants had a superior lien to that held by the owners of the bonds secured by the $2,700,000 mortgage, and no injunction was issued.

The history of these railroad companies and their obligations has been long and tedious, but its review was necessary to a proper appreciation of the character of this suit. It is an application to a court of equity by a part of the purchasers of the property of the old Mississippi Valley & Western Railway Company at the master's sale in 1875, who furnished about 4 per cent. of the purchase price; who have never furnished a dollar to improve the property thus purchased; who, under the decree of the district court of Lee county, received the same proportionate share of the property purchased and improved that their copurchasers in like situation received; who were offered in 1879, and who refused to buy, the bonds of the purchasing company that extended the railroad, at a price less than their copurchasers were obliged to pay for them in order to defray the necessary expenses of completing and equipping the railroad,—to obtain a decree that they have a lien for the share of the purchase price they furnished in 1875, on the finished railroad, which was completed and equipped, at an expense exceeding $1,300,000, after

their purchase, and on the faith and pledge of the $2,700,000 mortgage made by the new company, an' that this lien of theirs is superior to that of the bonds secured . this mortgage in the hands of subsequent purchasers. On the face of it, the case does not appeal to the conscience of a chancellor with compelling force. It has the appearance of an attempt to reap the fruits of the labor of others, who bore the heat and burden of the day while the applicants rested supinely in the shade. The only parties in interest before this court in this case are the appellants and the appellees Perkins and the Burlington Railroad Company.· The only question is whether or not the appellants were entitled to a lien on the property of the Keokuk Company superior to that of the bonds held by the appellees, and secured by the mortgage for $2,700,000. In the history of this case which we have given above, we have stated only the undisputed facts. If the case was to be determined upon these facts alone, there could be but one answer to this question. The appellants could not maintain their lien (1) because their contract of June 8, 1875, was the personal contract of Stone to the effect that Eells, the trustee, would hold an amount of the notes secured by the $600,000 mortgage equal to the amount of cash they paid towards the purchase in 1875, as collateral security for the repayment of that money, and that promise created no lien on any of the notes; (2) because Stone was their agent to secure these notes, and to place them with Eells as collateral security for this money, and if he failed to do so, and caused the notes to be canceled and the mortgage to be discharged, they must suffer the consequence of the acts of their agent, and not the purchasers of securities, who had a right to rely on those acts; and (3) because the decree of the district court in Lee county, Iowa, in 1878, completely settled the liens, rights, and interests of these appellants, as against Stone and his associates, in the purchase and construction of the railroad, and the question now presented is res adjudicata, and cannot be again litigated by the appellants, either with Stone and his associates, or their privies, the appellees.

The appellants seek to escape from this conclusion by allegations that are denied, and testimony that is contradicted. They claim that under the agreement of June 8, 1875, in which Stone promised them that Eells should hold a part of the $600,000 in notes as collateral security for the purchase money they supplied, under the terms of the sale by Stone to the Keokuk Company, which provided that the bonds and mortgage for $2,700,000 should be first used to pay and satisfy the $600,000 mortgage, and under the execution of the two mortgages, they acquired a first lien upon all the property of the Keokuk Company for the value of all the bonds, liens, and money they furnished to make the purchase, and that the holders of the bonds secured by the mortgage for $2,700,-000 took their rights subject to this lien, because Eells discharged the $600,000 mortgage without payment and without authority, and because the mortgage for $2,700,000 was, by the terms of the sale to the Keokuk Company, to be first used to pay the $600,000 mortgage. Their witnesses testified that Stone and Edmunds, his attorney,

told them in June, 1875, that the mortgage for $600,000 was to be made to secure the purchasers for the bonds, liens, and money they advanced for the purchase, and that Stone did not give the agreement of June 8, 1875, to enable them to borrow the $30,844.12 in money which they were to furnish, but solely to secure them for its repayment. On the other hand, Stone and his attorney testified that the agreement was given to them solely to enable them to borrow this money, and that the $600,000 mortgage was made, not to secure the repayment of the purchase price, but to obtain money to extend the railroad. They are corroborated by the testimony of Eells that he never heard of the contract of June 8, 1875, until after the $600,000 mortgage was discharged, and that he understood that that mortgage was made, not to secure the purchasers for the purchase price, but to raise money for construction purposes. The written contract of June 8th recites that Wilcox and others desire to borrow the $30,844.12 cash they were to furnish, and that Stone makes the agreement to enable them to do so, and in it Stone promises that Eells will hold an equal amount of the notes to be secured by the $600,000 mortgage, not to secure the repayment of the value of the bonds, liens, and cash they were to furnish, but to secure the repayment of the cash only. If, as appellants' witnesses testify, the Adrian parties did not declare to Stone and his attorney that they desired to borrow this money; if all parties, including Eells, the trustee, knew that this $600,000 mortgage was to be, and that it was, issued to secure these purchasers for the value of all they furnished, including bonds, liens, and cash,—it is incredible that Stone should have made, and that these appellants should have accepted, an agreement which recites that they want to borrow the money they are to furnish, that the agreement is made to enable them to do so, and which promises them collateral security, from the $600,000 in notes, for the repayment of the money they furnished only, and, by the strongest implication, excludes them from any security under that mortgage for the value of the bonds and liens they supplied. On the issue as to the purpose for which the mortgage for $600,000 was made, the written evidence is equally decisive. The terms of the sale by Stone, the agent of the purchasers and the holder of the title, to the Keokuk Company, which the purchasers formed and owned, were in writing, and are before us. That contract provided that the two mortgages,—one for $600,000, and the other for $2,700,000,—and the notes and bonds they were to secure, should be made by the Keokuk Company; that the bonds secured by the latter mortgage should be used first to pay off and satisfy the former mortgage; that all these notes and bonds secured by both mortgages should be placed in the hands of Eells, as trustee, and should be sold and disposed of as Stone should direct; and that the proceeds thereof should be used in the construction of the incomplete railroad, until it was completed. The conclusion from these writings is irresistible that the mortgage for $600,000 was made for construction purposes, and not to secure the repayment of the purchase money, and that the agreement made by Stone on June 8, 1875, with the Adrian parties,

was a mere personal contract of his, made to enable them to borrow the money they were to furnish, and that it could have no effect upon the securities issued by the Keokuk Company, unless it was executed. The fact is undisputed that the Adrian parties never borrowed any of this money, and that they themselves furnished it. Stone never caused Eells to hold any of the $600,000 in notes as collateral security for the repayment of this money, and never notified Eells that he agreed to do so. The agreement of Stone accordingly created no lien upon any of the notes or bonds issued by the Keokuk Company, and if it was broken the remedy of the appellants was an action against Stone for the breach. It is an established fact in this case that none of the notes secured by the mortgage for $600,-000 were used or sold for purposes of construction or equipment of the railroad, and that by direction of Stone, the financial agent of the company that made them, the notes were canceled, and the mortgage was discharged by Eells, the trustee. It is contended that this action was without authority. It may be conceded that, if the notes secured by this mortgage had been sold or pledged, the trustee would not have been authorized to discharge the mortgage without the consent of the holders of the notes. But, until they were pledged or sold, Eells, the trustee, held them as the agent of their maker alone, and he was authorized and bound to dispose of them as that maker directed. Before they were sold, pledged, or used in any way, the maker of the notes, through its financial agent, Stone, directed Eells to cancel the former and to discharge the latter. In our opinion, this not only gave him the power, but imposed upon him the duty, to do so. Moreover, as there never was any debt secured by the mortgage for $600,000 to pay or to satisfy, none of the bonds secured by the mortgage for $2,700,000 were required to be used first, or at all, for the purpose of satisfying any such debt, and there was no lien on the property of the Keokuk Company superior to that of the holders of these bonds.

A more conclusive answer to the claim of the appellants, if that were possible, is found in the decree of the district court of Lee county rendered in 1878. Stone brought that suit to settle all questions relating to the liens and interests of all parties interested under the original purchase, and of all who had furnished money or materials on pledges of the bonds of the Keokuk Company. All of the appellants in this suit were parties to that suit. The appellant Wilcox verified one of the answers to the bill, was one of the complainants in the cross bill, and with Angel, the other active representative of the appellants, attended and testified at the trial. Stone's petition contained an allegation that the mortgage for $600,-000 had been made, that it had not been used, and that it had been discharged. It set forth all the debts of the Keokuk Company, and stated what bonds were pledged to secure them. It stated in detail the value of the liens and bonds and the amount of the money furnished by each of the purchasers to buy the property at the master's sale. It prayed that the interests of all the parties to the suit. in the property of the company might be determined; that all of is assets might be distributed among them according to their re-

spective interests; and it presented to that court the very question now before us, by the allegation that the entire assets of the Keokuk Company stood pledged for its indebtedness for construction, and for the moneys paid into court by Stone upon the purchase, and that all these must be paid before the bonds and stock could be divided between the owners, and, by the prayer, that the moneys paid as hereinbefore stated upon said purchase be refunded to the purchasers, or be so prorated as that each should bear and pay its ratable proportion thereof. The court decided that question. It decided that the money should not be repaid, and that it should be prorated, and decreed to each purchaser stock of the railroad company, for the moneys, as well as for the bonds and liens, he furnished for the purchase. The answer and cross bill in that suit nowhere deny the allegation that the mortgage for $600,000 had never been used and had been discharged, nowhere aver that any of the Adrian parties have any lien upon the property superior to that of the bondholders, and nowhere mention the contract of June 8th, with Stone. The cross bill prays for a division of the bonds, stocks, assets, and property of the Keokuk Company in the hands of the railroad company, or of Eells, the trustee, among the parties to the suit, so that the ownership of said property may be found and settled by the decree. The court granted that prayer, determined the liens and interests of all the parties, and divided and distributed the bonds, stock, and assets of the corporation among the parties to that suit, by its final decree, rendered September 8, 1878. The share of the appellants in this property was determined by that decree to be a certain number of shares of the stock of the corporation, and they accepted that stock. They now ask that they may have and enforce a lien upon all the shares of all the other parties to that suit, for the bonds, liens, and moneys for which they received that stock. The answer is that it was adjudged by that decree that they had no such lien; that they were entitled to the stock which they received, and to that stock only. Appellants seek to escape from the legal effect of this adjudication by allegations and proof that the decree of the court in Lee county was procured by fraudulent representations made by Stone and his attorney to them as to the character of their lien, and as to the purpose and effect of the suit in Lee county. No fraud is alleged that deprived the appellants of ample notice of the existence of that suit, and of the time of its trial. A direct suit may undoubtedly be maintained, in a proper case, to set aside and annul a judgment of any court, and all proceedings under such judgment, for fraud in procuring them. Gaines v. Fuentes, 92 U. S. 10, 21; U. S. v. Norsch, 42 Fed. 417; 1 Black, Judgm. § 321, and cases cited. But until such a suit is brought, and until a decree of avoidance is rendered, the judgment of a state court which had jurisdiction of the subject-matter and of the parties is conclusive upon the merits of the controversies determined by that judgment between the parties and their privies, in every court in the United States, and cannot be collaterally impeached for fraud. Christmas v. Russell, 5 Wall. 290, 305; Maxwell v. Stewart, 22 Wall. 77, 81; Anderson v. Ander-

son, 8 Ohio, 108; Mason v. Messenger, 17 Iowa, 261, 272; Smith v. Smith, 22 Iowa, 516, 518; Railway Co. v. Hall, 37 Iowa, 620, 622. This is not a suit to set aside or avoid the decree of the court in Lee county, nor has any such suit been brought. The appellants do not pray here for an avoidance of that decree. The only plea they make with reference to it is that it is not a bar to this suit, because it was procured by the fraud they allege. They have mistaken the law. This is a suit between some of the parties to the suit in the district court of Lee county, and the assigns of other parties to that suit, to retry the very questions there adjudicated 16 years ago; and, so long as that decree stands, it is a complete bar to this proceeding, even if it was procured by the fraud and imposition which the appellants plead. The decree below must be affirmed, with costs, and it is so ordered.