CENTRAL TRUST CO. OF NEW YORK v. BODWELL WATER POWER
CO. et al.

(Circuit Court, D. Maine. September 16, 1910.)

No. 617.

1. MECHANICS' LIENS (§ 173*)—TIME OF TAKING EFFECT—MAINE STATUTE.
Under Rev. St. Me. c. 93, § 29, giving a mechanic's lien for labor or materials furnished in erecting, altering, or repairing a house, building, or appurtenance by virtue of a contract with or by consent of the owner, as construed by the Supreme Judicial Court of the state, the lien relates back and becomes effective as of the date of the contract under which the labor or materials are furnished.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 304; Dec. Dig. § 173.*]

2. MORTGAGES (§ 183*)—"CONSENT"—"OWNER"—MECHANICS' LIENS.
Under Rev. St. Me. c. 93, § 29, which gives a lien for labor or materials furnished in erecting, altering, or repairing a house, building, or appurtenances by virtue of a contract with or "by consent of the owner," as construed by the Supreme Judicial Court of the state, in order that the interests in real estate of any person shall be affected by reason of his statutory consent, he must be held to have set in motion a train of circumstances which necessarily, or reasonably, or ordinarily, resulted in the furnishing of labor and materials for which the lien is claimed. A mortgagee out of possession is not an "owner" within the meaning of the statute, nor can he be held to have consented to the displacement of his own lien merely because he may have knowledge of the making of the improvements.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 442; Dec. Dig. § 183.*

For other definitions, see Words and Phrases, vol. 2, pp. 1437–1441; vol. 8, p. 7612; vol. 6, pp. 5134–5151; vol. 8, p. 7744.]

3. CORPORATIONS (§ 473*)—BONDS—RIGHTS OF BONA FIDE HOLDERS.
Under the rule of the federal courts, any holder of negotiable bonds of a corporation secured by mortgage who acquired the same in good faith for a valuable consideration before maturity is affected only by what he actually knew, and not at all by what he might have known by the use of ordinary diligence; and this applies, not only to the bonds themselves, but to the security by way of mortgage which each bond assumes to carry with it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1842–1853, 1855; Dec. Dig. § 473.*]

4. CORPORATIONS (§ 478*)—MORTGAGES SECURING NEGOTIABLE BONDS—LIEN AND PRIORITY—MECHANICS' LIENS.
A water power company executed a mortgage to secure an issue of $1,000,000 in bonds. Later it made a contract for the construction of a power plant, and on the same day delivered to the contractor in payment $700,000 of the bonds, which the contractor on the same day sold, and within a few days forwarded to the mortgage trustee to be certified and delivered to the purchasers. Subsequent to all this, and after the mortgage had been recorded, the contractor made contracts with subcontractors for portions of the work, which under Rev. St. Me. c. 93, § 29, entitled the subcontractors to mechanics' liens as of the dates of their several contracts on the property. *Held*, that the $700,000 of bonds had been, under the rules prevailing in equity, in legal effect sold and delivered

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

before any of the subcontracts were made; and that as to them, the lien of the mortgage was superior to that of the subcontractors, who were charged with notice of the mortgage when they made their contracts.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 478.*]

In Equity. Suit by the Central Trust Company of New York against the Bodwell Water Power Company, James B. Mullen, the Stanley Manufacturing Company, the Grady Construction Company, and the Allis-Chalmers Company. Decree for complainant.

Joline, Larkin & Rathburn and Libby Robinson & Ives, for complainant.

Charles H. Bartlett, for Bodwell Water Power Co., Milford Construction Co., and receivers.

Joseph F. Gould and Charles F. Johnson, for James B. Mullen.

Edward P. Murray, for Grady Construction Co.

Martin & Cook and Benjamin Thompson, for Allis-Chalmers Co.

H. M. Verrill, for bondholders' committee.

PUTNAM, Circuit Judge. This is a bill in equity brought by the complainant against the Bodwell Water Power Company to foreclose a mortgage running to the complainant as trustee. The other parties respondent are James B. Mullen, Stanley Manufacturing Company, Grady Construction Company, and the Allis-Chalmers Company, who are joined because they claim statutory liens on the property involved, which is certain lands and water rights connected therewith, situate on the Penobscot river, in the city of Old Town and town of Milford, in the county of Penobscot. The mortgage grew out of the undertaking on the part of the Bodwell Water Power Company to develop the water rights in question, commencing in the year 1905, by the erection of a dam and a power house located therewith. The contract for the entire development was a single one, between the Milford Construction Company and the Bodwell Water Power Company, entered into on the 19th day of July, 1905. The parties named as respondents, aside from the Bodwell Water Power Company, were all subcontractors, claiming under section 29 of chapter 93 of the Revised Statutes of Maine, which reads as follows:

"Whoever performs labor or furnishes labor or materials in erecting, altering, moving or repairing a house, building or appurtenances,—by virtue of a contract with or by consent of the owner, has a lien thereon, and on the land on which it stands and on any interest such owner has in the same, to secure payment thereof, with costs."

Section 30 of the same chapter reads as follows:

"If the labor or materials were not furnished by a contract with the owner of the property affected, the owner may prevent such lien for labor or materials not then performed or furnished by giving written notice to the person performing or furnishing the same, that he will not be responsible therefor."

The principal questions in the case are those which we will particularly explain; and, although it is possible there may be some doubt whether the statute would attach a lien to all the property described in the bill, and perhaps some other questions, we will not consider them,

because the complainant concedes that for the purposes of this litiga-tion everything is established in favor of the lien claimants except pri-ority. That question arises in the following manner:

On the 1st day of July, 1905, the Bodwell Company, as already stated, executed and acknowledged the mortgage which the complain-ant is now seeking to foreclose. It was duly recorded on the 24th day of July, 1905; its acceptance by the complainant having been acknowl-edged by the complainant on the 21st day of the same July. It does not appear on what precise day it was accepted by the complainant. The date of acknowledgment is, of course, unessential. The date of acceptance may be essential. But, in the absence of a more definite statement, it must be held to have been accepted on the day of the acknowledgment by the complainant.

The mortgage provides for the issue of negotiable bonds to the amount of $1,000,000. To make it perfectly clear, it may be stated that these bonds were of such a character that they showed on their face that they were secured by the mortgage referred to; and alto-gether they were of such a character that in the hands of any bona fide holder they, and the apparent security given them by the mortgage, were free from all undisclosed claims.

On the 19th day of July, 1905, a contract was executed between the Bodwell Company and the corporation known as the Milford Com-pany, by virtue of which the Milford Company contracted to install all the work out of which every claim made by the respondents in this case arose. All the respondents making such claims were subcon-tractors under the Milford Company. The contract with the Milford Company stipulated to receive in part payment for its work $700,000 of the bonds secured by the mortgage in controversy. These bonds were all subsequently delivered to the Milford Company or on its order. The Milford Company, of course, is estopped from making any claim adverse to the mortgage, or to any title thereunder, and makes no such claim. In fact, it has been quite fully, if not entirely, paid for all the work done and materials furnished by itself or subcontractors. The subcontract with the respondent Mullen was executed on the 29th day of July, 1905, and the first work done by him was on the 7th day of August, 1905. On the 19th day of July, 1905, the Milford Company had sold in advance the $700,000 of the bonds to be delivered to it under the contract; and on the 28th day of July, 1905, $500,000 of these bonds had been delivered to the Milford Company, which on the 29th day of the same July had the same certified by the complainant, and sold and delivered the same to brokers at New York at 90 per cent. and interest. We will refer again to some important details relating to the disposition of the bonds.

As the statutes have been interpreted, it cannot be doubted that each lien claim of each respondent here relates back to the day when each contract for labor and materials was made, notwithstanding the work was commenced later. For example, the lien claim of respondent Mullen relates back to the 29th day of July, 1905. This arises from the fact that it is settled that the statutes establishing lien claims are to be liberally construed, and that the principles relating to their nature

are governed by equitable rules. Shaw v. Young, 87 Me. 271, 274, 32 Atl. 897; Hill v. American Surety Company, 200 U. S. 197, 202, 26 Sup. Ct. 168, 50 L. Ed. 437; Mankin v. United States, 215 U. S. 533, 537, 30 Sup. Ct. 174, 54 L. Ed. ——. More particularly as to this, it is said in Ouelette v. Pluff, 93 Me. 168, 176, 44 Atl. 616, 619, referring to proceedings for enforcing lien claims, that "an in rem process like the present is really an equitable process largely governed by equitable principles." It must be said that it is on this account that lien claims get the benefit of the equitable doctrine of relation, and more particularly of the equitable doctrine that what is agreed to be done is held as done, by virtue of which the lien claim becomes effective from the date of the contract out of which it arises. It follows that, inasmuch as the holders of lien claims thus avail themselves of equitable rules, they are bound to submit to them whenever they may work against them, an observation which we will apply as we go on.

Inasmuch as all the respondents who hold lien claims are subcontractors under the Milford Company, and inasmuch as the Milford Company is, as we have shown, estopped from setting up any title which will depreciate the mortgage, it would ordinarily follow according to the proper and strict rules of equity that, as the stream cannot rise higher than its source, all subcontractors under the Milford Company would be estopped to the same extent as the Milford Company is estopped. Apparently, however, this fundamental principle of equity is shut out by the decision of the Supreme Judicial Court of Maine in Norton v. Clark, 85 Me. 357, 27 Atl. 252. That would seem to be a sweeping decision to the effect that the respondents in this case are not estopped simply because the Milford Company is estopped, in that it squarely holds that an agreement between the principal contractor and the owner of a building that there should be no liens incurred for labor and materials with reference to its construction does not estop a subcontractor from establishing a lien for what he contributed to the result. As the opinion in this case was passed down in 1893, 12 years and more before the initial steps in the present controversy were taken, and as it concerns the construction of a statute of the state of Maine, it is binding on us. Nevertheless, it does not reach another equitable doctrine to which we have already referred, and to which we will refer again more fully.

Starting with this general description of the case, one point on which the respondents rely is that the interests which the mortgage represents have given their "consent" within the purview of the statute. As to this, we are compelled to observe that the Supreme Judicial Court of Maine has shown a special disposition to soften off the meaning of the word "consent" in Shaw v. Young, 87 Me. 271, already cited, at page 276, 32 Atl. 897. The opinion passed down in behalf of the court in that case points out the origin and development of the statutes which we have cited. It observes that prior to 1868 a lien could arise only by virtue of a contract "with the owner." Then, in 1868, were introduced the words "by the consent of the owner"; but in the latter statute it was provided that such "consent" should not be inferred unless notice was first given to the owner that a lien would be claimed. The opinion then observes that by the act of 1876, now in-

corporated in the Revised Statutes, which we have quoted, the requirement of notice to the owner was stricken out; but the provision that the owner might give notice of dissent was retained, or substituted, whichever may have been the fact. The opinion reasons that this change materially modified the effect of the word "consent" in favor of the lien claimant, and points out circumstances of a somewhat doubtful character from which the "consent" may be inferred. It cannot be said, however, that the proper lexicographical meaning of the word "consent" was changed by these modifications of the statute. All that can be maintained is that, in view of the modifications, the inferences in favor of "consent" by the owner may be more easily drawn. Applying this, the Supreme Judicial Court of Maine has given more or less effect to the inferences, but in every instance having relation to the questions of fact and not to the questions of law. The latest of these decisions is York v. Mathis, 103 Me. 67, 68 Atl. 746, in which the lien was sustained from rather weak circumstances of fact. Nevertheless, it is there said that something more than "mere acquiescence" is required to constitute a statutory consent. It may be said that the fair description of what may ordinarily be required as amounting to "consent" by the owner is found in Baker v. Waldron, 92 Me. 17, 42 Atl. 225, 60 Am. St. Rep. 483, where, in connection with the delivery of possession of certain real estate by the owner to another party, there was an express stipulation that the other party should make certain improvements on the property. There the owner did not take part in making the improvements; yet he purposely set in motion a train of circumstances out of which the improvements necessarily arose. Consequently in that case he may be fairly said to have consented; and a fair construction of the statute and of the decisions of the Supreme Judicial Court of Maine in reference thereto must come back to something of that nature, that is, to the proposition that, in order that the interests in real estate of any person shall be affected by reason of his statutory consent, he must be held to have set in motion a train of circumstances which necessarily, or reasonably, or ordinarily, resulted in the furnishing of labor and supplies for which a lien is claimed.

As to the relation of the mortgagee to this just rule of the construction of these statutes, we are first to consider the fact that a mortgagee out of possession is not in equity, and in the state of Maine in law, "owner" of the property. The statute does not apply to him by its terms in using the word "owner." There is no just reason why it should be extended by construction to apply to him; and the Supreme Judicial Court of Maine has never held directly that it does apply to him. If he takes possession of the property, receives its income, and directs its management, then, of course, he becomes an "owner," both in equity and at the common law of Maine. Until he does all that, he holds in fact only a lien, as he would in name under the laws of the state of New York and the laws of other states. For all practical purposes, he is no more than the holder of a lien. Having this fact in view as a leading fact, we find no circumstances in this case arising from the claim, to some extent supported by proofs, that the mortgage lienors, whether the trustee or the bondholders, to a certain extent had knowledge of the intended improvements, or of the fact that the im-

provements were being made, or acquiesced therein, or assisted therein by advancing funds to the Bodwell Company for the purpose of making payments to the Milford Company, or placed themselves in a position other than the normal and ordinary position of a mortgagee. Therefore, without going into any questions with reference to the fact that, under some limited circumstances, to a very limited extent, notice to the trustee, like the complainant here, or the knowledge of such trustee, or the qualified acquiescence of such trustee, may or may not bind the holders of negotiable bonds secured by a mortgage to such trustee, we hold that there is not sufficient here to turn aside the fundamental rule affecting mortgagees which we have stated. Therefore we hold that it is not proven here that "consent" has been given, as required by the statutes referred to.

Each respondent further claims that, so far as bonds secured by the mortgage had not been actually disposed of to bona fide holders prior to the contract out of which his lien claim arose, he would be compelled to redeem only to the extent of the bonds so outstanding. Of course, it is understood that in the federal courts any holder of any of these bonds who acquired the same in good faith for a valuable consideration is affected only by what he actually knew, and not at all by what he might have known, or by what he was put on the point of discovery by the use of ordinary diligence. The rule of the federal courts is strict in these particulars. This applies not only to the bonds themselves, but to the security by the way of mortgage which each bond assumes to carry with it.

Mullen claims that no bonds had been disposed of at the time his contract was made, so that, so far as he was concerned, there was no mortgage security affecting him. We think we can dispose of the case by investigating its relations to him, thus covering once for all the whole body of respondents. We have given some of the dates affecting his contract; but we will repeat them in order to give the whole story consecutively.

The trust mortgage was signed and acknowledged by the Bodwell Company on the 1st day of July, 1905. The contract with the Milford Company was executed on the 19th day of July, 1905. This contract provided for payment to the Milford Company of $700,000 of the bonds secured by the mortgage in controversy. The contract with Mullen was made on the 29th day of July, 1905. On the 19th day of July, 1905, the Milford Company accepted an offer from Farson, Leach & Co. to deliver to them this $700,000 of bonds at 90 per cent. and interest. On the 28th day of July, 1905, the Milford Company voted to forward to the complainant for certification $500,000 of these bonds, at which time it had received from the Bodwell Company the entire mass of $700,000 of bonds which were to be delivered to it according to the contract we have spoken of. Therefore at that time it was in the power of the Milford Company to have the bonds certified by the trustee, and to deliver them to Farson, Leach & Co. in accordance with the contract made with them. On the 29th day of July, 1905, which was the same day that the contract was made with Mullen, the Milford Company forwarded $500,000 of the bonds to the com-

plainant for certification and delivery to Farson, Leach & Co.; and the certification was completed on the 31st day of July, 1905, and the bonds actually delivered to Farson, Leach & Co. on the 8th day of August, 1905. As already said, the trust mortgage had been acknowledged and recorded on the 24th day of July, 1905, which was before the contract with Mullen was executed. Therefore, in law Mullen is assumed to have had knowledge of the mortgage at the time his contract was made; the mortgage having been duly executed by all the parties and recorded prior thereto. The bonds were not complete in form, but the sale of them had been perfected; and in equity what was agreed to be done must therefore be held to have been done, notwithstanding the lack of certain formalities which were afterwards completed; so that in equity the sale of the bonds was perfected to Farson, Leach & Co. on the 19th day of July, 1905, 10 days before the contract with Mullen was executed. The certification and delivery of the remainder of the bonds, namely, $200,000, making a total of $700,000, in accordance with the agreement of the 19th day of July, 1905, and the previous contract with the Bodwell Company, was subsequently duly completed; so that the whole transaction took effect as of the 19th day of July, 1905. Thus in equity and for our purposes the whole mass of $700,-000 of bonds were delivered to bona fide purchasers before the contract was made with Mullen, and Mullen must therefore certainly, for the reasons already stated, redeem this $700,000 and accumulated interest before his lien can be made of any value.

As all the other respondents maintaining claims for liens are subsequent in priority to Mullen, what we have already said closes the case in favor of the complainant so far as the bonds to the amount of $700,000 disposed of as already described and interest thereon are concerned. Nevertheless, this leaves $300,000 of the bonds which were neither disposed of nor negotiated until after Mullen's lien claim attached, nor, of course, until the other lien claims held by the respondents also attached. On account of this, therefore, the respondents raise a question the answer to which would dispose of the whole case in favor of the complainant, notwithstanding the prior negotiation of the bonds agreed to be paid to the Milford Company in the manner we have determined. The respondents base their answer to this question on a ruling of the Circuit Court of Appeals in the Eighth Circuit, made on November 15, 1897, in Reynolds v. Manhattan Trust Co., 83 Fed. 593, 599, 27 C. C. A. 620, which they maintain decides that each lien claim here has priority as against any bond not actually sold before each respective lien claim attached. That would seem to be the effect of the reasoning of the opinion in that case, although there no bond whatever had been disposed of at the time of the origin of the lien claim in question; and the only authority cited by the court was Peninsular Iron Co. v. Eells, decided by the Circuit Court of Appeals for the same circuit on May 6, 1895 (68 Fed. 24, 15 C. C. A. 189), but the opinion in that case at page 34 of 68 Fed., at page 189 of 15 C. C. A., shows that the mortgage there had been discharged, no bonds having been issued when it was discharged, so the only question was as to the authority to discharge vested in whoever did discharge it. It is not at all the proposition we have before us. On the other

hand, to yield to the decision in Reynolds v. Manhattan Trust Company would be to subvert the universal practice of the federal courts in this particular, disregard all the authorities of any value bearing on the question, and destroy the commercial value of this class of securities. In Central Trust Company v. Louisville Ry., decided by the Circuit Court in the District of Kentucky on October 1, 1895 (70 Fed. 282), the reasoning of the previous authorities stated at page 288, as opposed to the respondents here, seems to be unanswerable. Mr. Chief Justice Waite in Claflin v. South Carolina R. Co. (C. C.) 8 Fed. 118, 125, also explains the position in favor of the complainant here very forcibly. This was in 1880, and the rule as there stated has been followed by the federal courts when it came directly in point. Also, in New Jersey in two suits in favor of the same complainant who appears here on February 26, 1894, in equity (Central Trust Co. v. Continental Iron Works, 51 N. J. Eq. 605, 28 Atl. 595, 40 Am. St. Rep. 539), and on November 14, 1894, at law (Central Trust Co. v. Bartlett, 57 N. J. Law, 206, 30 Atl. 583), the same rule in behalf of the mortgagee and the holders of the bonds secured by the mortgage was positively stated. The proposition seems a simple one. As we have said, the several lienholders here are assumed to have had knowledge of the mortgage from the date it was recorded, which was prior to any time as of which any lien claim accrued, and from that mortgage they are presumed to have known that it secured negotiable bonds which passed by delivery, and so that each became indisputable in the hands of every person acquiring it for a valuable consideration and in good faith. As we have said, any rule other than that which the complainant here maintains would destroy the general negotiability of this class of securities; and, as the principles of estoppel operating in favor of the holders of negotiable securities are sufficient to obviate this evil, we do not hesitate to apply those principles here, without at the present undertaking to determine what the result would be if the obligations secured by the mortgage were not negotiable in character.

We therefore hold that the respondents and each of them must redeem against the outstanding $700,000 of bonds which we have especially described, with interest, and against any other portions of the issue of $1,000,000 of bonds which came into the hands of bona fide holders for a valuable consideration before the Bodwell Company defaulted on its interest payments accruing thereon. We are advised by the record that at least a portion of the remaining $300,000 of bonds, making up the $1,000,000, had been negotiated in the manner we have described. We have not such information from the record as to enable us to determine satisfactorily what portion is covered by this statement. This must go to a master for an accounting in reference thereto.

The complainant will on or before the 21st day of September, 1910, in accordance with rule 21, file a draft decree for a foreclosure and accounting, according to the opinion passed down this 16th day of September, 1910, and the respondents will file corrections thereof on or before the 26th day of the same September; and all questions of costs are reserved.