REYNOLDS et al. v. MANHATTAN TRUST CO. et al.

(Circuit Court of Appeals, Eighth Circuit. November 15, 1897.)

No. 667.

1. MECHANICS' LIENS—TIME OF CONTINUANCE.
   Under the Nebraska law which gives to a subcontractor 60 days from the last day of the month in which the labor was done or materials furnished to file his claim therefor, and declares that the lien shall continue for two years (Consol. St. 1891, §§ 2170, 2171), the lien of such a contractor continues, not for two years from the expiration of the 60 days, but only for two years from the time when the last act was done in the performance of the contract, whereby the lien first becomes determined in amount, so as to be complete and actionable.

2. SAME—RAILROAD MORTGAGES.
   A recorded railroad mortgage held by the trustee before any bonds are issued or any mortgage debt created is held by it merely as the agent of the railroad company, so that mechanics' liens which attach prior to the issuance of any bonds are prior in lien.

3. SAME—FILING MECHANIC'S LIEN—CONTINUANCE OF LIEN.
   Under the Nebraska statute which provides that the failure to file the statement of claim within the periods of 90 or 60 days, as required in the cases of contractors and subcontractors respectively, shall not defeat the lien, except against purchasers or incumbrancers, in good faith, without notice, whose rights accrued after the expiration of such periods (Consol. St. 1891, § 2171), a lien exists for two years in favor of a subcontractor, without the filing of any statement or notice of lien whatever, as against all purchasers and incumbrancers whose rights accrue after the commencement of work by such subcontractor, and before the expiration of 60 days from the last day of the month in which the contract is completed.

4. RESCISSION OF CONTRACTS.
   Where a railroad subcontractor has agreed to subscribe for certain amounts of stock and bonds of the railroad company, and to accept from the principal contractor such stock and bonds at their par value, in part payment of the work to be done, and thereafter the principal contractor pledges all the stock and bonds to a third party, so as to disable himself from making delivery thereof, this is in itself a repudiation of the subscription contract, and gives the subcontractor a right to treat it as a rescission, and sue the principal contractor for the amount which he was to receive in stock and bonds. And a settlement and receipt in full made by the subcontractor, without knowledge of such pledge of the stock and bonds, and his acceptance of the certificate of the trust company that he was entitled to the stock and bonds, would not prevent him from asserting a mechanic's lien for the amounts which he had agreed to take in stock and bonds.

83 F.—38

5. MECHANICS' LIENS.

Where a contractor has bestowed his labor and material upon the improvement until he has completely performed his contract, a lien exists in his favor; 'and, if the owner has not paid for the work or material in any way, it is immaterial in what way he promised to pay, and the contractor may avail himself of the security which the statute gives him.

Appeal from the Circuit Court of the United States for the District of Nebraska.

F. M. Hall and G. M. Lambertson (J. W. Deweese on the brief), for appellants.

John L. Webster (Craig L. Wright on the brief), for appellees.

Before SANBORN and THAYER, Circuit Judges.

SANBORN, Circuit Judge. This case presents a contest for priority between a mortgage and mechanics' liens upon a railroad. The mortgage was made on July 1, 1889, and was recorded in November of that year, but no bonds were issued under it until April 10, 1890. The mechanics' liens were based on two construction contracts, one of which was made on April 18, 1889, and work under it was completed on October 1, 1889; while the other was made on December 14, 1889, work under it was commenced at about that time, and was continued until about June 27, 1890, when it was completed. The appellee the Nebraska & Western Railway Company was the mortgagor, and the appellee the Manhattan Trust Company was the trustee to whom the railway company gave this mortgage to secure bonds to the amount of $2,583,400 which were to be issued under it. The appellants are the members of a partnership styled E. P. Reynolds & Co., which built the railroad covered by the mortgage under the two contracts which have been mentioned. On December 18, 1890, the trust company exhibited its bill for the foreclosure of the mortgage. On June 30, 1891, a decree of foreclosure was rendered. A sale was made under this decree, which was confirmed on October 30, 1891. Reynolds & Co. had not been parties to this suit, and on November 2, 1891, they filed a cross bill in it to establish mechanics' liens for $37,400, which they claimed to be due upon their first construction contract, and for $13,600, which they claimed to be due upon their second construction contract. They sought by this cross bill to charge the moneys in the hands of the court which were the proceeds of the foreclosure sale with a first lien in their favor. Their claim was contested by the trust company and the railway company, by answers which they filed to the cross bill; and bonds were given to secure the payment of the amounts of these liens in case they should be adjudged to be superior to that of the mortgage. The court dismissed the claim for the lien for the balance due under the first contract upon the face of the pleadings, and referred the questions of fact and law which arose under the claim for the balance under the second contract to Mr. William A. Redick, who reported the facts in detail, and found that the appellants had a lien upon the proceeds of the sale superior in equity to that of the bondholders under the mortgage. The trust company filed exceptions to this report, which were sustained by the circuit court, and a decree

was entered which dismissed the cross bill. The appeal challenges this decree.

The facts out of which this controversy arises are these: The mortgage, by its terms, covered the railroad, the franchises, and all the after-acquired property of the mortgagor, but the railroad was constructed by Reynolds & Co. under their contracts after the mortgage was made and recorded. On March 15, 1889, the railway company made a contract with the Wyoming Pacific Improvement Company for the construction of its railroad. The substance of that agreement was that the improvement company would construct the railroad, and the railway company would pay for the construction $20,000 in cash and $20,000 in its first mortgage bonds for every mile of railroad that the improvement company built. On April 18, 1889, Reynolds & Co. made a contract with the improvement company, to the effect that they would build about 80 miles of this railroad, and that the improvement company would pay them therefor in cash, on monthly estimates of the engineer. They finished the performance of this contract on October 1, 1889. Their final estimate was settled by crediting them with $37,400 upon the amount which they owed to the improvement company upon a subscription which they had made for $68,000 of its stock, and by paying them a balance of about $5,000 in cash. Thereupon, on October 8, 1889, they gave to the improvement company a receipt in full for their claim against it under this first contract. The subscription which has been mentioned was made by Reynolds & Co. on April 20, 1889. By the terms of the subscription contract, Reynolds & Co. agreed to pay to the Manhattan Trust Company, for the use of the improvement company, $68,000 in certain installments; and the improvement company agreed that, when these payments were completed, it would deliver to them first mortgage bonds of the railway company to the amount of $34,000 on or before April 20, 1891, or as soon thereafter as issued, and negotiable certificates for stock of the improvement company to the amount of $37,400. They had paid several installments upon this subscription contract in cash, and, after the credit of the $37,400 which they had earned by the construction of the 80 miles of railroad under the first contract, they still owed the improvement company on the subscription contract $13,600 on December 14, 1889. On that day they made a second contract with the improvement company for the construction of an additional 46 miles of the railroad, and immediately entered upon its performance. This contract contained an agreement of the improvement company to pay for the construction in cash on monthly estimates, and a promise that the $13,600 owing on the subscription contract should not be declared in default, until the completion of, and the final settlement under, the construction contract. When this second construction contract was made, the mortgage had been made and recorded, but no bonds had been issued under it. On February 1, 1890, while Reynolds & Co. were engaged in the performance of this contract, the Manhattan Trust Company and five other parties agreed to loan to the improvement company, and to pay over to the trust company, $1,050,000 for the purpose of purchasing the right of way and paying for the construction of the railroad which Reynolds & Co. were building. This promise was made on the ex-

press condition that the money loaned should be collected from the lenders and disbursed by the trust company for that purpose, and that all the bonds issued or to be issued by the railway company should be pledged with the trust company to secure the repayment of the money so loaned. On the same day, and as a part of the same transaction, the railway company, the improvement company, and the trust company made a written agreement, by which all the bonds to be issued under the mortgage were pledged with the trust company to secure the repayment of the money to be advanced under the agreement for the loan; and by this agreement the trust company was authorized to sell these bonds at public or private sale in case of a default by the improvement company in the repayment of the loan when due. Between April 9, 1890, and August 31, 1890, $1,050,000 was loaned to the improvement company under these agreements, and $450,000 more, and all the bonds, except bonds to the amount of $9,980, were issued and delivered to the trust company as collateral security for these loans. The bonds to the amount of $9,980 were issued on September 18, 1890, and delivered to the trust company for the same purpose, and no additional moneys were advanced by the lenders on account of this issue. In December, 1890, the improvement company procured another loan of $270,000 through the trust company, for which it pledged some of these railway bonds to the amount of $675,000, and it used the proceeds of this loan to repay a part of the first loan. The improvement company failed to pay these loans when they fell due, and the bonds were sold under the pledges in May and June, 1891, for 10 and 15 per cent. of their par value. A large portion, and perhaps all of these bonds, were purchased for the pledgees. If any of them were purchased for any other parties, the record does not disclose for whom.

When Reynolds & Co. completed their second contract, in June, 1890, their final estimate was $66,173.97. They consented that the $13,600 which they still owed to the improvement company, by the terms of their subscription contract, should be charged against this estimate, accepted the balance of the estimate in cash, and gave to the improvement company a receipt in full for all claims arising under their second construction contract. When this fact came to the attention of the trust company, on July 7, 1890, that company credited the $13,600 on the subscription certificate of Reynolds & Co., and issued to them two certificates,—one to the effect that they were entitled to receive on May 1, 1891, or as soon thereafter as they should be issued, mortgage bonds of the railway company to the amount of $34,000; and another that they were entitled to stock of the improvement company to the amount of $37,400. These certificates were subsequently assigned by J. H. Reynolds, one of the members of the firm of Reynolds & Co., for the firm, and were thereafter subdivided into several certificates of like character; but none of the bonds of the railway company and none of the stock of the improvement company has ever been tendered or delivered to Reynolds & Co., or to any member of the firm, on account of their subscription and its payment. On August 29, 1891, Reynolds & Co. filed, in the proper offices in the counties through which the railroad extended, accounts and affidavits of the materials they had furnished and the labor they had performed under these two con-

struction contracts, and claimed liens upon the railroad for the balances of $37,400 and $13,600 which they claimed to be due to them under these contracts respectively. The foregoing facts were undisputed.

The following facts were questioned, but, in our opinion, they are established by the evidence in this record: At the time that Reynolds & Co. permitted the $13,600 which was due to them upon their seond construction contract to be applied in payment of their subscription, they did not know that all the bonds which the improvement company had received or was to receive from the railway company had been pledged by it as collateral security for its notes, and they assented to this application of the $13,600 in the expectation that they would receive the bonds and a proper certificate for the stock called for by their subscription upon making their final payment upon it. They would not have consented to this application if they had known that the improvement company had disabled itself from delivering the bonds. The Manhattan Trust Company acted in these transactions for itself and as trustee and agent for the railway company, the improvement company, and the lenders for whose benefit the bonds were pledged as collateral security. The trust company knew of the two construction contracts of Reynolds & Co., of their subscription to the stock of the improvement company, of the terms of their subscription contract, of the manner in which the two credits of $37,400 and $13,600 were made upon that contract, and it knew that those sums represented the respective balances due them in money upon their construction contracts. It also knew at the time when the credit of $13,600 was made that all the bonds of the railway company which had been or could be lawfully issued had been pledged as collateral security for the debts of the improvement company, so that the latter could not deliver the bonds called for by the subscription contract of Reynolds & Co. E. P. Reynolds, Jr., was the managing partner of Reynolds & Co., and he was the only member of the firm who had authority to sign the contracts or checks, or to handle the securities of the firm. He refused to accept for the firm the certificate for the bonds issued by the trust company on July 7, 1890. The indorsement of that certificate by J. H. Reynolds for the firm was without authority, and the trust company had notice of this fact. The record discloses many other facts, but none that are material to the questions that must be determined by this court.

The first question which demands consideration in this case challenges the action of the court in dismissing the appellants' claim for a lien for $37,400 under their first construction contract. The labor and material bestowed upon a building or a railroad by a contractor enhance the value of the property of the owner, and become lost to the builder. If he receives no compensation for them, he never can take them back, but the owner and those who take under him receive all their benefits. It is therefore just and equitable that the laborer and material man should have a lien for their wages, and for the value of their materials, upon the improvements which they construct; and statutes which authorize such liens should be liberally construed, to advance this reasonable and salutary remedy. Nevertheless, the me-

chanic's lien does not exist under the common law. It is the crea-
ture of the statute which establishes it, and must stand or fall by the
law of its creation. The statute of Nebraska on which these liens are
based provides that, when the material has been furnished or labor
performed in the construction of any railroad in that state, the con-
tractor or subcontractor shall have a lien therefor upon the roadbeds
and improvements he makes, and upon all land upon which the same
may be situated, including the rolling stock thereto appertaining, and
the right of way of the railroad upon which the improvements are situ-
ated. It provides that every person, whether contractor or subcon-
tractor, who claims such a lien, shall file with the clerk of the county
in which the property to be charged with the lien is situated, a true
statement of the time when the material was furnished or labor per-
formed, and of the time when the contract was completed, verified by
his affidavit, and that—

"Such verified statement or account must be filed by a principal contractor with-
in ninety days, and by a sub-contractor within sixty days, from the date on
which the last of the material shall have been furnished, or the last of the labor
is performed; but a failure or omission to file the same within the periods last
aforesaid shall not defeat the lien, except against purchasers or incumbrances
in good faith without notice, whose rights accrued after the thirty or ninety
days, as the case may be, and before any claim for the lien was filed: provided,
that when a lien is claimed upon a railway, the sub-contractor shall have sixty
days from the last day of the month in which said labor was done or material
furnished within which to file his claim therefor: * * * provided further,
that such lien shall continue for the period of two years, and that any person
holding such lien may proceed to obtain a judgment for the amount of his ac-
count thereon by civil action; and when any suit or suits shall be commenced
on such accounts within the time of such lien, the lien shall continue until such
suit or suits be finally determined or satisfied." Consol. St. Neb. 1891, §§ 2170,
2171.

It is insisted that the cross bill to enforce the lien under the first con-
tract was not exhibited within the time of the lien. The work under
that contract was commenced in the spring or summer of 1889, and
was completed on October 1st of that year. The statute provides
that the lien shall continue for the period of two years. The cross
bill was not filed until November 2, 1891. The only question pre-
sented by these facts is, when did the two years of the continuance of
the lien commence to run? The lien undoubtedly attaches at the
time when the contractor commences to perform his agreement, and it
continues and grows pari passu with the work as it progresses, so that
in one sense it commences and continues from the time when the per-
formance begins. But it does not become fixed in amount or capa-
ble of enforcement until the last act has been done to complete the
performance of the contract, and it is only from that time that a vested
lien for a determined amount can be said to exist and continue. It
may be argued with considerable force that a lien exists and contin-
ues unimpaired, under the first part of section 2171, for 60 days after
the last day of the month in which the performance of the contract
is completed without the filing of any statement or claim to it, and that
the subsequent proviso, which declares that it shall continue 2 years,
extends the term of its existence for 2 years from the expiration of the
60 days. But that construction would continue it for 2 years and

60 days at least, and the provision of the statute is express and clear that it shall continue for 2 years. Accordingly, our conclusion is that the true construction of this section 2171 is that the lien of the railroad contractor continues 2 years, and no longer, from the time when the last act is done in the performance of the contract, from the time when the lien first becomes determined in amount, complete, and actionable. The lien under the first contract had therefore expired two months before the cross bill was filed, and the claim for this lien was properly dismissed. Fowler v. Bailley, 14 Wis. 136, 141, 142; Chapman v. Wadleigh, 33 Wis. 267.

The lien under the second contract stands in a different position. It attached to the property in December, 1889, when the appellants commenced the performance of that contract. At that time the mortgage to the trust company secured no bonds,—no debt,—because no bonds had been issued and no mortgage debt had been created. Until bonds were issued and sold or hypothecated, the trust company held the trust deed as the mere agent of the railroad company, and was bound to release or dispose of it as that company directed. It had no superior right to or better claim upon the mortgaged property than the mortgagor itself. Iron Co. v. Eells, 32 U. S. App. 348, 363, 15 C. C. A. 189, 199, and 68 Fed. 24, 34. There is no doubt that the lien of a recorded mortgage securing bonds which have been issued or sold and pledged is superior to any claim or equity of a subsequently created debt of the mortgagor for the construction of the railroad mortgaged, which is not secured by a mechanic's lien. Railroad Co. v. Hamilton, 134 U. S. 296, 299, 10 Sup. Ct. 546. But the debt of these subcontractors was secured by a mechanic's lien, which had attached, and was superior to the interests of both the mortgagor and the trustee under the mortgage, before any of the bonds it was to secure had been pledged or issued. It is true that the statute under which this lien was created required these subcontractors to file the statement of their lien within 60 days from the last day of the month in which their labor was done or their material was furnished, and that they did not file it until nearly a year after that time had expired; but the statute also provided that "a failure or omission to file the same [the statement] within the periods last aforesaid shall not defeat the lien, except against purchasers or incumbrances in good faith without notice, whose rights accrued after the thirty or ninety days, as the case may be, and before any claim for the lien was filed." The effect of this statute was to give to the subcontractors a lien upon the railroad which they constructed as against the owner, and as against all purchasers and incumbrancers under it whose rights accrued after they commenced the performance of their contract, and before the expiration of the 60 days after the last day of the month in which they completed it, without the filing of any statement or notice of their lien whatever. The theory and reason of the statute are that during the construction of the railroad, and for 60 days after the last day of the month in which the performance of the contract is completed, the new railroad itself shall be notice to all purchasers and incumbrancers of the lien of the subcontractors upon it, and that all who take any title to or incumbrance upon the improvement or the right of way on which

it stands during this time shall take their rights and claims cum onere, and with constructive notice of the mechanic's lien upon it.    In this view it is that the statute expressly declares that the failure to file the claim of lien within the time prescribed shall not defeat it except against purchasers and incumbrancers in good faith and without notice, whose rights accrued after the expiration of the 60 days.    It divides innocent purchasers and incumbrancers for value into two classes,—those whose rights accrued between the commencement of the performance of the contract and the expiration of the time prescribed for the filing of the statement of the lien, and those whose rights accrue after the expiration of that time.    It declares that the lien of the mechanic or contractor, as against the claims of the members of the former class, shall prevail, and that it shall not be defeated by any failure to file the statement and claim of the lien, but that, as against the rights of the members of the second class, any omission to file it before the expiration of the prescribed time shall be fatal.    Wisconsin Trust Co. v. Robinson & Cary Co., 32 U. S. App. 435, 439, 15 C. C. A. 668, 670, and 68 Fed. 778, 780;  Hill v. Building Co. (S. D.) 60 N. W. 752, 757;  Sarles v. Sharlow, 5 Dak. 100, 109, 37 N. W. 748; Evans v. Tripp, 35 Iowa, 371, 372;  Kidd v. Wilson, 23 Iowa, 464;  Noel v. Temple, 12 Iowa, 276, 281;  Neilson v. Railway Co., 44 Iowa, 71, 73; Curtis v. Broadwell, 66 Iowa, 662, 664, 24 N. W. 265; Hoskins v. Carter, 66 Iowa, 638, 24 N. W. 249;  Doolittle v. Plenz, 16 Neb. 153, 20 N. W. 116;  Squier v. Parks, 56 Iowa, 407, 409, 9 N. W. 324;  Gilcrest v. Gottschalk, 39 Iowa, 311, 315.    Conceding now that the pledgees of the mortgage bonds had no actual notice of the claims or of the lien of the appellants, their rights were nevertheless subject and inferior to that lien by the express terms of this statute.    They were members of the former and not of the latter class of incumbrancers.    Their rights accrued after the appellants had entered upon the performance of their second contract, and between February 1, 1890, when the agreement for the hypothecation of the bonds was made, and August 29, 1890, when the 60 days for filing the statement of the appellants under the statute expired.    Between these dates the entire $1,500,-000 was advanced upon the security offered by the bonds, and while it appears that at some subsequent time $270,000 was loaned by some one on the pledge of bonds to the amount of $675,000, and was applied to the payment of a part of the original loan, and that all the bonds were subsequently sold under the pledges, it also appears that a part of these bonds were purchased at the sales for the original pledgees; and it does not appear for whom the others were purchased; nor does it appear that any of the bondholders ever acquired any rights superior to those of the original pledgees.    The lien of the appellants under their second contract, therefore, must be held to be prior in time and superior in equity to that of the bondholders under the mortgage, by force of the statute of Nebraska which created and established it.

It is contended, however, that the acts of the appellants in June and July, 1890, permitting the balance due on this construction contract to be credited on their contract of subscription for the stock of the improvement company, receipting for the amount due under the construction contract, and taking, indorsing, and permitting a subdi-

vision of the certificates of the trust company that they were entitled to the railway bonds and the stock due them under their subscription contract, constitute a waiver of this lien, and are fatal to the attempt to enforce it. Before entering upon the discussion of this position, let us obtain a clear understanding of the situation of these parties when these acts were done. The improvement company owed the appellants $13,600 in money for their work under the construction contract. That company had agreed by the contract of subscription that it would deliver to them railway bonds secured by the first mortgage of the Nebraska & Western Railway Company to the amount of $34,000, and certificates for stock of the improvement company to the amount of $37,400, in consideration of the $68,000 which the appellants had agreed to pay to it therefor. The latter had already paid on this contract $54,500, and there was still due upon it $13,500. Meanwhile the improvement company had become insolvent, so that its stock and its promises were alike worthless, and it had disabled itself from the performance of the subscription contract by pledging all the railway bonds it was entitled to receive to secure advances it could never repay. This act of the improvement company was in itself a repudiation of the subscription contract, and it had already given to the appellants the right to accept this action as a rescission of the contract, and to sue the company for a recovery of the $54,500 which they had paid upon it. Smiley v. Barker, 83 Fed. 684; Ankeny v. Clark, 148 U. S. 345, 353, 13 Sup. Ct. 317; Nash v. Towne, 5 Wall. 689, 701. Perhaps the appellants would have exercised this right if they had known these facts. But they were not aware of them, and in their ignorance they allowed the improvement company to set off its indebtedness to them under the construction contract against their supposed indebtedness to it under the subscription contract. In other words, they exchanged the promise of an insolvent corporation to pay them $13,500 in money for its promise to pay them in bonds and stock, which it had already disabled itself from performing, and for the certificates of a trust company that they were entitled to the performance of this promise. We are now prepared to consider the contention of the appellees at this point. Their claim is that this exchange of promises, the execution of their receipt by the appellants, and their acceptance of the certificates of the trust company, waived their lien and satisfied their claim. The position is utterly untenable. If the promise of the improvement company had been performed, if the bonds and certificates for the stock had been delivered, the lien would undoubtedly have been discharged. But the proposition is now too well settled to admit of discussion that an agreement to pay the debt secured by a mechanic's lien by the note of the promisor, or by the bond, note, mortgage, or other obligation of a third person, will effect no waiver of the lien when that agreement has never been performed. If the contractor has bestowed his labor and material upon the improvement until he has completely performed his agreement, the lien exists; and, if the owner has not paid for the work or material in any way, it is immaterial in what way he promised to pay, and the laborer or material man may avail himself of the security which the statute creates. McMurray v. Brown, 91 U. S. 257; Chicago & A.

R. Co. v. Union Rolling-Mill Co., 109 U. S. 702, 721, 3 Sup. Ct. 594; Wisconsin Trust Co. v. Robinson & Cary Co., 32 U. S. App. 435, 441, 15 C. C. A. 668, 671, and 68 Fed. 778, 781; Central Trust Co. v. Richmond, N., I. & B. R. Co., 31 U. S. App. 675, 687, 15 C. C. A. 273, 278, and 68 Fed. 90, 94. The exchange of promises therefore did not destroy the lien. Nor did the delivery of the receipt. It is a general rule that a receipt is open to explanation. It never estops the receiptor from proving the truth, unless some one has acted on the faith of it to his prejudice; and this receipt is buttressed by no such action. It was signed and delivered in consideration of the delivery of the railway bonds and the certificates for the stock which the appellants then believed they would receive as soon as information of the receipt and settlement could be forwarded from Sioux City, Iowa, where it was signed, to the trust company in New York. The appellants have never received and never can receive the consideration for this receipt, and it cannot bar them from showing these facts and enforcing their lien.

Finally, it is strenuously argued that this cross bill seeks relief through the rescission of the contract of settlement, which cannot be granted, because the appellants accepted the certificates for the bonds and stock issued under this settlement by the trust company, indorsed those certificates, and permitted them to be subdivided and reissued. It is true that it is a condition precedent to the rescission of a contract that he who has received or deprived the other contracting party of anything of value under it must return it, and restore the latter to his original situation. But this rule has no application to the case in hand, (1) because the certificates of the trust company which were issued under the settlement were never accepted or indorsed, but were rejected by the only member of the firm of Reynolds & Co. who had authority to act for them in the premises; and (2) because, if we concede that these certificates were indorsed by Reynolds & Co., they did not confer upon them or deprive the trust company or the improvement company of anything of benefit, advantage, or value. The improvement company had made a worthless promise, which it had disabled itself from performing. The certificates of the trust company were nothing more than its statements that the appellants were entitled to the fulfillment of this worthless promise. The trust company did not guaranty its performance, or obligate itself in any way to the appellants. Its certificates vested no rights and imposed no obligations. Their return to the trust company would neither have released an obligation nor conferred a benefit. Their return was therefore not a prerequisite to a rescission of the contract of settlement, because the law never requires the performance of an idle ceremony. Moreover, the joint acts of the improvement company and the trust company by which they pledged all the bonds to secure loans from strangers, and thus disabled the former company from delivering the bonds, were in themselves a distinct repudiation of the contract of settlement, and gave to the appellants the option to accept those acts as a rescission of the contract, and to recover the consideration they gave for it, or to bring an action against the improvement company for damages for breach of the contract. Smiley v. Barker, 83 Fed. 684; Nash v. Towne, 5 Wall. 689, 701; Ankeny v. Clark, 148 U. S. 345, 353, 13 Sup.

Ct. 317; Eames v. Savage, 14 Mass. 425; McCrelish v. Churchman, 4 Rawle, 26; Baston v. Clifford, 68 Ill. 64; Stahelin v. Sowle, 87 Mich. 124, 49 N. W. 529; 2 Smith, Lead. Cas. (7th Am. Ed.) 30, note; Withers v. Reynolds, 2 Barn. & Adol. 882; Planché v. Colburn, 8 Bing. 14; Palmer v. Temple, 9 Adol. & E. 508; Tiff. Sales, 235. The appellants have chosen the former alternative, and are rightfully pursuing it. Their claim for their lien under the second contract must accordingly be sustained. The decree below is reversed, with costs; and the case is remanded to the circuit court, with directions to overrule the exceptions to the report of the special master to confirm that report, and to render a decree in accordance with its recommendations.