SPRAGUE v. PROVIDENT SAVINGS & TRUST CO. et al.

(Circuit Court of Appeals, Sixth Circuit. June 17, 1908.)

No. 1,785.

1. EQUITY—PLEADING—SUFFICIENCY OF ANSWER—WAIVER BY FAILURE TO EX-CEPT.

A complainant in equity in a federal court who joins issue upon the answer, and goes to hearing without excepting thereto, is not entitled to thereafter move for decree because of its insufficiency.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, § 665.]

2. MECHANICS' LIENS—WAIVER OF RIGHT IN CONTRACT.

A provision of a building contract by which the contractor expressly waived the right to a mechanic's lien as against the holders of bonds issued by the owner and secured by mortgage on the property held effective, and not abrogated by subsequent dealings between the parties.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mechanics' Liens, §§ 381, 382.]

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

Proceedings by intervention in suit brought by the Provident Savings & Trust Company to foreclose a mortgage upon the Harrison Building in Columbus, Ohio. The case is here on the appeal of Sprague, receiver of Ellis & Co., intervener, from an order made subsequent to the decree of foreclosure and sale, denying to appellant a mechanic's lien under the contract of Ellis & Co. for the construction of the Harrison Building, and adjudging liens in favor of interveners Esswein, Winston, Powell, and the Electric Supply & Construction Company, under their subcontracts with Ellis & Co.

The essential facts are these: On November 14, 1901, one Blackburn, who held a permanent lease (upon the payment of ground rentals) of the lot on which the Harrison Building was later erected, contracted with Ellis & Co. for the erection by the latter of the building in question for the sum of $300,000, covering both labor and materials, the building to be finished by April 1, 1903, payments upon the contract price to be made monthly on architects' certificates to the extent of 90 per cent. of the proportion of work done and 50 per cent. of materials on the ground, the final 10 per cent. to be retained until after 30 days from the final completion of the building, final approval of the architects, and acceptance by the owner. Express provision was made for transfer by Blackburn of his rights in the real estate under the building contract to the contemplated corporation, and that upon such transfer the corporation should be substituted in Blackburn's place. At the same time a side contract was made between Blackburn and Ellis & Co., for the payment by the latter to the former of $60,000 in monthly payments of $5,000 each (later modified by substituting a proportionate amount of each estimate as paid), as so-called rebates. This arrangement was made for the stated purpose of meeting ground rents, taxes, discounts, and commissions on sales of bonds, and interest upon bonds accruing before the completion of the building, together with architects' fees, so that the building when completed would represent a net investment of $300,000. By another arrangement Ellis & Co. were also to pay the commission of one Moling for obtaining the ground lease, the amount of this compensation being stated generally in the record as $5,000, although what apparently is the same item is stated in the written agreement between Moling and Harrison as $4,400. Ellis & Co. were thus to receive net for the building about $235,000. The defendant Harrison later acquired the rights of Moling and Blackburn, the latter receiving a share of the prospective net profits of the Harrison Building Company, and Ellis & Co. were notified by Harrison of the assignments in question; no objection being made thereto. The Harrison Building Company was organized April 10, 1902 (Harrison taking practically all its stock), and soon afterwards

163 F.—29

received the assignment of the rights of Harrison and Blackburn under the original building contract. The construction of the building was begun a few days before the formation of the Harrison Building Company, and as a result of an arrangement made on the day of the formation of that company the time for completing the construction was extended until December 1, 1903. The mortgage under foreclosure ($300,000) was made by the building company March 5, 1903, and on June 6, 1903, $115,000 of the mortgage bonds were issued to Harrison on account of his advancements of $110,000 and upwards, made before that time in connection with the construction of the building under the contract with Ellis & Co. The company had also made a temporary loan at the bank of about $23,000. On July 27, 1903, when the building was partially completed, there had been paid to Ellis & Co., under the construction contract, about $128,000, and that firm had repaid, under its rebate contract, $23,649.24. On that date a contract was made between the Harrison Building Company and Ellis & Co. reciting that the building company was contemplating borrowing money to be used in the further construction of the building, and that the amount borrowed on the bonds might be insufficient to pay for the entire completion of the building, and containing an express agreement on the part of Ellis & Co. to complete the work in accordance with the terms of their contract for $140,000 in addition to what had already been paid (with like provision for payments of architects' estimates as in the original contract), and "to turn over said building fully completed to said Harrison Building Company, its successors or assigns, as provided in said contract, hereby waiving all rights as contractors, or otherwise, to any lien upon said building as against bonds issued by said building company or the mortgage securing the same," and that such stipulation should operate in favor of any person or corporation loaning money on the security of the bonds.

In the same connection an agreement was made between Ellis & Co. and Knauss & Gamble, real estate agents and officers of the Harrison Building Company, reciting the agreement of July 27, 1903, before referred to, and providing that the rebates mentioned should be paid by Ellis & Co. to Knauss & Gamble from time to time, and that the fund so made should be deposited in the Manufacturers' & Merchants' Bank (called the "M. & M. Bank"), and should be used to pay Ellis & Co.'s estimates on the building at such times and in such manner as they might elect, with the express provision that the signing by Ellis & Co. of the agreement of July 27, 1903, should not release the responsibility of the principals or their successors on the original contract with Ellis & Co. for the erection of the building. The agreement of July 27, 1903, contained a reference to this proposed arrangement with Knauss & Gamble as securing "W. H. Ellis & Co. in the payment of the balance of the money due on their said contract for said building in addition to the amount of $140,000 stipulated as above." In connection with the making of these contracts, an arrangement was made between the building company and Knauss by which the building company issued $175,000 more of mortgage bonds, which, together with the $115,000 of bonds previously issued to Harrison, were deposited with the Columbus Trust & Savings Bank as collateral to a note of $190,000 executed by Knauss, the proceeds of which were to be used in taking up the temporary loan of $23,000 before referred to, paying the discount upon the note and the services of the trust company and providing the $140,000 for payment to Ellis & Co., the balance to be used for construction expenses, ground rents, and taxes. Up to March 7, 1904, there had been paid to Ellis & Co. out of this $140,000 fund in the Columbus Savings Bank & Trust Company $120,182.40, leaving in that fund and in that bank $19,817.60. A controversy having arisen over the construction of the building, Ellis & Co. filed a mechanic's lien, claiming the $300,000 provided by the contract plus $8,000 for alleged extras, and giving credit for payments to the extent of $244,204.85. As a result of this action a suit was begun by the building company against Ellis & Co. in the state court, under which Ellis & Co. were temporarily restrained from proceeding with the erection of the building. April 9, 1904, a stipulation was filed in the suit in the state court providing for an immediate specification by the architects of the particulars wherein the building failed of completion according to the contract, for an immediate completion of the building by Ellis & Co. according to the specifications and

contract, and for making payments to the subcontractors, to the extent of the previously unexpended contract price plus such allowance as should be made by the architects for extras; and providing that neither the right of Ellis & Co. to claim additional compensation, nor the right of the building company to claim that the work and materials claimed as extras, were required by the contract were waived, and that the pending suit, as well as the rights of each party under the contract, including such status as the Ellis & Co. lien might have, should be unaffected by the arrangement referred to. A few days later the architects made a specification of the details in which the building failed of completion according to the contract, estimating that $10,890 was required for such completion, and on May 25, 1904, gave a more detailed statement specifying numerous particulars in which the building was incomplete. September 9, 1904, Ellis & Co. filed a second claim of lien, demanding $37,293.01 for extras in addition to the contract price, and giving credit for payments amounting to $243,254.85. On January 17, 1905, the $290,000 of bonds held by the bank as collateral to the Knauss loan for $190,000 were bought by Harrison for $190,714.45. This was done to prevent a sacrifice of the $115,000 of bonds owned by Harrison, as well as the $175,000 pledged with it under the Knauss agreement. The foreclosure suit was begun January 6, 1906. Subsequently Sprague, receiver of Ellis & Co., intervened by cross-bill under leave of the court, and later the subcontractors, Esswein, Winston, Powell, and the Electric Supply & Construction Company were permitted to intervene. On May 16, 1906, a decree of mortgage foreclosure was made (the amount due being $326,153.02), and sale of the premises was ordered free of liens, the fund arising from the mortgage sale to be substituted for the mortgaged premises, all questions of priority being reserved for further hearing.

The premises were sold to Harrison under the decree for $150,000, the sale was confirmed, satisfaction of the mortgage ordered, and he was permitted to retain $50,000 of the purchase price for application upon the bonds (payment of the remaining $100,000 to the marshal being directed), and hearing was had upon the question of priority of liens. The trial judge filed an opinion, under which decree of distribution was made. The court held the lien of Ellis & Co. invalid, upon the ground that, when the claim of lien was filed, the building had not been completed, nor had it been approved by the architects or accepted by the owner; and upon the further ground that, as to the claimed extra work, none was done in accordance with the requirements of the contract, in that there was no written agreement between the parties authorizing the extra work or payment therefor, or any evidence to show that the owner by any act or conduct on his part waived or is estopped from asserting a right to the strict performance of the contract in respect to extras. The court also found that the building was never completed, and that the value of the extra work was, at most, but a few hundred dollars.

It was further held that the liens of the four subcontractors in question were valid and unaffected by the failure of the principal contractors to complete their contract; those of Esswein ($5,640.63) and the Electric Supply & Construction Company ($511.95) being held to antedate the mortgage bonds, and thus to be payable in full out of the proceeds of the mortgaged premises, and those of Winston ($3,784.04) and of Powell ($10,157.50) to be subsequent to the mortgage and payable ratably to the extent of $12,184.17, as part of the rebate fund deposited in the M. & M. Bank; which, to the extent stated, the court held had been misappropriated by Ellis & Co. to the detriment of the subcontractors, and without their consent. The balance of the $150,000 remaining above the payment of costs, receiver's expenses, fees, etc., was required to be paid to Harrison (as the holder of $290,000 of the bonds), less $10,000 and the interest thereon reserved for further order, on account of a conflict of ownership over the remaining $10,000 of bonds.

The only appeal taken is that on behalf of the receiver of Ellis & Co. Upon this appeal, no question is made as to the decree in the case of Winston, and as to the other three subcontractors no question is made as to the performance and completion of their work, and as to their right to compensation therefor; the contention being that they are not entitled to liens unless Ellis & Co. are so entitled.

C. Southworth and H. L. Rockel, for appellant.

J. J. Lentz and J. E. Bruce, for appellees.

Before LURTON and RICHARDS, Circuit Judges, and KNAP-PEN, District Judge.

KNAPPEN, District Judge (after stating the facts as above). A preliminary question is presented by the contention of appellant that the trial court erred in refusing to permit him to file a motion and affidavits for a decree in his favor against the Harrison Building Company upon the pleadings.

The proposition is based upon this situation: The answer of the Harrison Building Company to the cross-bill of appellant contained several admissions, grouped in eight separately numbered paragraphs. The ninth paragraph states that:

"This defendant denies each and every allegation and averment contained in said cross-bill of James M. Sprague, receiver of W. H. Ellis & Co., not herein expressly admitted."

The appellant filed replication to this answer, and went to hearing upon pleadings and proofs. The record indicates that, after the entry of final decree against appellant, the latter moved for a decree of judgment against the Harrison Building Company upon the pleadings, and that the court refused to permit the motion and affidavits to be filed. Regardless of the fact that the motion seems to have been made after final decree, the action of the court was proper. If appellant regarded the answer as insufficient, he should have excepted to it upon that ground. Having replied to it, and having gone to hearing, it is.too late to raise the question of the technical insufficiency of the answer, as that it was too general. 1 Bates on Federal Equity Procedure, § 350, and following; General Equity Rule 61. It is true that by joining issue upon the answer its legal sufficiency as a defense is no longer conclusively admitted, but the facts stated and determined avail the defendant "as far as in law and equity they ought to avail him." General Equity Rule 33; Green v. Bogue, 158 U. S. 478, 500, 15 Sup. Ct. 975, 39 L. Ed. 1061; Butler Bros. Shoe Co. v. U. S. Rubber Co., 156 Fed. 1, 5, 84 C. C. A. 167. But an exception to the answer for insufficiency raises not the question of the insufficiency of the facts stated in the answer in point of law, as a defense to the action, but only the question as to whether sufficient discovery has been made by the defendant, or the averments fully answered, or questions relating to scandal or impertinence (Pennsylvania Co. v. Bay [C. C.] 138 Fed. 203, 206), and general equity rule 61 expressly provides that, if no exception for insufficiency be made to the answer within the time provided by that rule, "the answer shall be deemed and taken to be sufficient."

At the outset we are confronted with the important question of the effect of the waiver of the mechanic's lien contained in the agreement of July 27, 1903. The language of the waiver is clear and explicit. It declares that the contractors waive "all rights as contractors or otherwise to any liens upon said building as against the bonds issued

by said building company or the mortgage securing the same." It is not contended that this contract did not create a waiver of the right to a mechanic's lien, nor could such contention well be made. As was said by Mr. Justice Miller in Grant v. Strong, 18 Wall., 624, 21 L. Ed. 859:

"The question whether a lien is obtained, or is displaced when it once attaches, is largely a matter of intention to be inferred from the acts of the parties and all the surrounding circumstances."

See, also, McMurray v. Brown, 91 U. S. 257, 23 L. Ed. 321, and cases there cited; Central Trust Co. v. Richmond, N. I. & B. R. R. Co., 68 Fed. 90, 15 C. C. A. 273, 41 L. R. A. 458.

Appellant's proposition is, however, that this waiver was conditioned upon the application to the contractors' claims of the special rebate fund provided to be deposited in the M. & M. Bank; that in violation of this condition, and without the consent or acquiescence of Ellis & Co., Harrison caused to be drawn from the rebate fund in the M. & M. Bank the amount represented by building estimate No. 15, viz., $17,104.17, less $5,000 deducted for rebates, and later caused the voucher to be cashed from the $140,000 fund in the Columbus Savings Bank & Trust Company; and that the result of this misappropriation of the special security set aside for the payment of appellant's demands is an abrogation of the waiver of the lien and restores appellant to all rights of lien existing in the absence of such waiver.

It may be conceded that such misappropriation, if established, would abrogate the waiver in whole or in part. Chicago & Alton R. R. Co. v. Union Rolling Mill Company, 109 U. S. 702, 3 Sup. Ct. 594, 27 L. Ed. 1081; Van Stone v. Stillwell & Bierce Manufacturing Company, 142 U. S. 128, 12 Sup. Ct. 181, 35 L. Ed. 961; Central Trust Company v. Richmond, N. I. & B. R. R. Co., 68 Fed. 90, 15 C. C. A. 273, 41 L. R. A. 458; McMurray v. Brown, 91 U. S. 257, 23 L. Ed. 321. But whether entirely, or merely to the extent of such misappropriation, is immaterial, in the view we take of the case. The burden of proof is clearly upon appellant to establish the fact of the alleged misappropriation, as against the rights of Ellis & Co. The trial judge did not pass upon the question as concerning the rights of Ellis & Co., but did hold that there was a misappropriation of at least $12,104.17 by the building company, as against the subcontractors, upon the ground that Harrison had received secret rebates from Ellis & Co., to the extent of $23,649.24, to the prejudice of the subcontractors, and that the building company got the benefit of these rebates to the extent of $12,104.17, thus depleting the sum available for the benefit of the subcontractors.

An examination of the record fails to satisfy us that there was a misappropriation of which Ellis & Co. can complain. The testimony of Kennedy, a member of the firm of Ellis & Co., is to the effect that the voucher for $17,104.17, which is the one in question, was receipted for "on the $300,000 contract"; that it was in the same form as those paid from the $140,000 fund; that on its presentation to Knauss & Gamble the latter "gave their own individual check on the M. & M.

Bank" for that amount, less $5,000—this deduction being not on account of the rebates which made up the fund of $60,000, but on account of the commission for negotiating the ground rent lease. This check was apparently given February 2, 1904. He testified that Knauss & Gamble agreed "to hold the voucher as against Ellis & Co.," and not collect it from the Columbus Savings Bank & Trust Company, later testifying that "they [Knauss & Gamble] understood the circumstances, but they wanted to draw out of that fund," meaning, as we understand, the fund in the Columbus Savings Bank & Trust Company. Knauss denies any knowledge or recollection of an arrangement that the voucher should not be drawn from the $140,000 fund in the same way that other like vouchers were drawn. Gamble did not testify. The check on the M. & M. Bank was not produced. It does not appear whether or not Knauss & Gamble had more than one account at the M. & M. Bank. The check may have been drawn from the rebate fund, but Kennedy's testimony, that the check given by Knauss & Gamble was "their own individual check on the M. & M. Bank," does not satisfy us that the check in question was drawn against the rebate fund. Taken altogether, it appears to us quite as consistent with the construction that there was not enough in the rebate fund to pay the voucher, that it was accordingly paid from Knauss & Gamble's individual account, and that what Kennedy wanted was that Knauss & Gamble should hold the voucher until there should be enough in the rebate fund to pay it. It may be that it was drawn against the rebate fund, and that a double payment was made to the extent of $12,104.17, and that a misappropriation of that amount was effected without the consent of Ellis & Co. We can only say that we are not satisfied from the testimony that appellant has sustained the burden of proving that there was such double payment or such misappropriation.

It is further contended that the waiver was abrogated by an alteration of the contract subsequent to the agreement of July 27, 1903, so that the proposal embodied in that contract was not complied with. We cannot assent to the proposition that the building contract contemplated by the agreement of July 27, 1903, is proven to have been so altered as to abrogate the express waiver of lien as against the bondholders. The original contract apparently contemplated extras by forbidding compensation for the same, "except that written agreement therefor be first signed and the said extra charges agreed to in writing by the said party of the first part, or his successors or assigns, and agreed to by said second party's bondsmen." The agreement of July 27, 1903, contains nothing to the contrary. On the other hand, it evidently contemplated that extras would be required beyond the specifications of the original contract, for it recited that "the amount borrowed on said bonds may be insufficient to pay for the entire completion of said building." Inasmuch as at least $100,000 appears to have been paid before July 27, 1903, the $140,000 deposited in the Columbus Savings Bank & Trust Company would have been sufficient to pay the remainder of the original net contract price of $240,000, and Kennedy's testimony seems to treat the $140,000

fund as applicable "to the $300,000 contract." Unless, therefore, extras were contemplated, there was no apparent need of providing an additional fund out of the rebates. But, regardless of this consideration, we are unable to see how there could have been any alteration of the contract without the consent of Ellis & Co. If they consented to such alteration, clearly they cannot predicate an abrogation of the waiver upon an alteration so assented to. If there was no assent by them, there could have been no alteration binding upon them, and so no abrogation.

The consideration that the lien of the principal contractors has failed of establishment by reason of their express waiver thereof does not necessarily affect the status of the liens of the subcontractors. Conceding, for the purposes of this opinion, at least, that under the present Ohio statutes (Rev. St. Ohio 1906, §§ 3184–3195) the subcontractors' lien cannot, except under circumstances not here material, take precedence of the lien of the principal contractor, and notwithstanding the fact that the personal liability of Ellis & Co. to the subcontractors is made by the contracts to depend upon the making of payments to the former by the owner, as held by this court in Re Ellis, 143 Fed. 103, 74 C. C. A. 297, there is no inconsistency, under the circumstances here presented, between the awarding of a lien to the subcontractors and the denial of a lien to the principal contractor. It is sufficient to say that it is not denied that the subcontractors have fully completed their contracts and are equitably entitled to compensation therefor; that neither the owner nor the bondholders are here complaining of the awarding of liens to the subcontractors; and, if Ellis & Co. are to be denied a lien because they waived it, they cannot well complain that their subcontractors have been substituted in their place to the extent stated.

It being determined that no lien in favor of Ellis & Co. exists, the questions of accounting need not be settled here. The decree of the court below is affirmed, upon the ground that the waiver of Ellis & Co. was effectual as to the mortgage bondholders, but without prejudice to any and all suits now pending or which may hereafter be brought between the appellant or Ellis & Co. and the Harrison Building Company and William P. Harrison, either or both, with respect to liability under the contracts in question; and without prejudice to the rights of the defendants, Winston and Powell, to maintain suit for whatever amount of their respective claims may not have been satisfied under the decree in this cause.

NOTE.—The following is the opinion of Thompson, District Judge:

THOMPSON, District Judge. This suit was brought by the Provident Savings Bank & Trust Company against the Harrison Building Company to foreclose a mortgage upon certain real estate in the city of Columbus, Ohio, consisting of a leasehold for 99 years, renewable forever, upon which there is a 12-story office building. They were the only parties to the suit. Afterwards Sprague, receiver of W. H. Ellis & Co., a partnership, which as contractor erected the office building, and certain subcontractors, claiming to have mechanics' liens upon said building, were permitted to intervene and set up their liens, and others claiming to have rights and interests in the property were also permitted to intervene and set up their claims. Some of the interveners

have not only filed intervening petitions, but also cross-bills covering the same matters, presumably being in doubt as to the form and style of the pleading required.

Intervention is "the admission, by leave of the court, of a person not an original party to pending legal proceedings by which such person becomes a party thereto for the protection of some right or interest alleged by him to be affected by such proceedings." Bouvier's Law Dictionary, 1114. A cross-bill is a mere auxiliary suit, and must touch the matters in question in the original bill. If it concerns matter different from the original bill, it is not a cross-bill. Cross v. De Valle, 1 Wall. 1, 17 L. Ed. 515; Rubber Co. v. Goodyear, 9 Wall. 807, 19 L. Ed. 587. Here the interveners by their cross-bills do not touch the matters in question in the original bill, but only seek the protection and enforcement of the liens which they set up. They do not question the right of the complainant to foreclose its mortgage and bring the property to sale, but intervene to set up their own liens and have them protected and their priorities recognized. Original defendants or defendants brought into the suit as proper, necessary or indispensable parties may file cross-bills, but those who are not necessary or indispensable parties, who by leave of the court are permitted to come in for the protection of their rights and interests in the subject of the litigation, would best describe themselves as intervening petitioners, presenting their claims by intervening petitions. Here the subcontractors were not necessary or indispensable parties, and, had they not come in, their liens would not have been discharged by the sale of the property in the foreclosure suit by the complainant, but would continue against the property in the hands of the purchaser. Esswein and Winston, by leave of the court, filed intervening petitions, and without the leave of the court also filed cross-bills, and Powell and the Electric Supply & Construction Company filed cross-bills. The cross-bills of Esswein and Winston will be stricken from the files and the cross-bills of Powell and the Electric Supply & Construction Company will be treated as intervening petitions.

The "Second Defense" of the answer of the Harrison Building Company to the cross-bill of James M. Sprague, receiver of W. H. Ellis & Co., sets up the pendency in the court of common pleas of Franklin county, Ohio, of a suit by W. H. Ellis & Co. against the Harrison Building Company and others, in which it is alleged that the petitioner states the same identical cause of action as is contained in the said cross-bill of James M. Sprague, receiver herein; that the Harrison Building Company, by cross-petition in said cause, asks judgment against W. H. Ellis & Co. for $60,000, and that W. H. Ellis & Co., against the objection of the Harrison Building Company, on May 10, 1906, dismissed said suit without prejudice to its right to bring a new action, and then alleges that 18 persons, partnerships, and corporations named, have some interest in the property, and prays that all proceedings in this court be stayed pending the proceedings in the state court, and that the 18 persons, partnerships, and corporations named be made parties to this suit, and that process issue against them. To this "Second Defense" a demurrer has been interposed by W. H. Knauss and John T. Gamble and Knauss & Gamble, two of the persons and one of the partnerships named, upon the ground, among other things, of multifariousness. It is entitled the "Joint and Several Demurrer of W. H. Knauss and John T. Gamble and Knauss & Gamble, Partners, to the Answer and Cross-Bill of the Harrison Building Company," but the text shows that it was directed against the so-called "Second Defense." The character of the pleading, however, would justify the court in acting upon its own initiative. This pleading does not show that the persons, partnerships, and corporations named are necessary or indispensable parties to the pending controversy, and, as it was filed after the sale and the confirmation of the sale of the property, it is difficult to comprehend what interest the Harrison Building Company has in bringing them before the court. Any liens or interests they may have upon or in the property have not been impaired or destroyed by the sale, and the purchaser, W. P. Harrison, who took the property subject thereto, has not asked that they be brought in. Nor can this court arbitrarily stay the proceedings in this suit to await the proceedings in the state court in the action by the Harrison Building Company against

W. H. Ellis & Co., presumably to recover damages for a breach of the contract for the construction of the building in question. The demurrer, therefore, will be sustained to the so-called "Second Defense," and the costs incurred in serving process upon said persons, partnerships, and corporations and all costs incident thereto, will be charged against the Harrison Building Company.

February 9, 1905, the Harrison Building Company made an assignment of its property for the benefit of its creditors, which was filed in the probate court of Franklin county, Ohio, to be administered, and on February 14, 1905, W. P. Harrison brought suit in the court of common pleas of Franklin county, Ohio, against Alexis Cope, the assignee, to set aside the assignment, which was done upon the execution of a bond in the sum of $150,000, conditioned to pay the debts of the Harrison Building Company, including costs of administration in the probate court, and also including attorney fees. For the reasons stated in memorandum opinion of November 1, 1906, the demurrers of plaintiff to the cross-petitions of Cope and Sheets will be sustained.

The pleading entitled, "Amended and Supplemental Answer and Cross-Bill of the Harrison Building Company to the Cross-Bill of James M. Sprague, Receiver of W. H. Ellis & Company," was filed out of rules and without leave of the court, and was not brought to the attention of the court at the final hearing of the case, nor was evidence offered in support of it, and the matters therein set up are irrelevant to the matters in controversy and the motion of Sprague, receiver, to strike it from the files will be sustained.

### Rulings of the Court Upon Admission of Evidence.

The objections to the admission of evidence numbered in pencil in the stenographer's report of the testimony 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26, 27, 28, 29, 30, 31, and 32, are overruled and those numbered 21, 21½, 25, and 33 are sustained.

### The Claim of the Contractor.

November 14, 1901, W. H. Ellis & Co. contracted to erect and construct a 12-story office building for Joseph E. Blackburn "or for his successors or assigns in interest," in strict and careful accordance with plans and specifications to be prepared by the architect, and to furnish all material of every kind and description necessary therefor, and for which Blackburn or his successors or assigns were to pay W. H. Ellis & Co. the total sum of $300,000 in monthly installments, upon the certificate of the architect of the work done and materials furnished during the preceding month, the final installment to be $30,000, but not to be paid "until after thirty days from the final completion of the building, final approval of the architect and acceptance by the owner." March 18, 1902, Joseph E. Blackburn assigned his interest in the contract and property to W. P. Harrison, who on July 2, 1902, assigned the same to the Harrison Building Company, a corporation organized April 10, 1902, for that purpose.

Installments were paid from time to time as the work progressed, until a controversy arose as to whether the building had been completed in accordance with the terms of the contract, and thereupon, on April 9, 1904, in a suit pending in the court of common pleas of Franklin county, Ohio, in which the Harrison Building Company was plaintiff and W. H. Ellis & Co. and others were defendants, a written stipulation was signed and filed by the parties, by which it was agreed that Samuel Hannaford & Sons, architects, in charge of the construction of the building should forthwith, in writing, specify wherein they claimed that the building had not been completed in accordance with the terms of the contract, and that a copy of such specifications should be delivered to W. H. Ellis & Co. at as early a date as possible, and that within three days succeeding the delivery of such copy W. H. Ellis & Co. should advise the Harrison Building Company in writing of their objections, if any they might have, to the claim made by such architects, and W. H. Ellis & Co., irrespective of their disagreement, if any they had with the claims of such architects, should as speedily as practicable complete the build-

ing in accordance with the specifications and contract, not waiving, however, any right they might have to compensation for extra work, and the Harrison Building Company not waiving its rights to claim and assert that such work and materials were required to be done and furnished by the contractor. This stipulation was filed subsequent to the filing by W. H. Ellis & Co. of the affidavit for a mechanic's lien. The architects thereupon, in April, made an examination of the building and made a report, which was objected to by W. H. Ellis & Co. as being too general in its terms, and afterwards, on the 20th and 21st days of May, 1904, made a further investigation, and on the 25th of that month made a specific report, taking up the building, room by room and item by item, which was delivered to W. H. Ellis & Co., and which, or a copy thereof, was put in evidence and shows hundreds of items required by the contract which was then unfinished.

(1) Did the contract of July 27, 1903, supersede the original contract? Was the right of the contractor to a mechanic's lien restored by a violation of the contract of July 27, 1903, by the owner? The original contract was not superseded by the contract of July 27, 1903, but only modified as to the consideration; the latter contract providing that W. H. Ellis & Co. "will complete the work on said building in accordance with the terms thereof for the sum of $140,000, in addition to sums already paid. Said sum to be paid on estimates to be made by the architect during the progress of said work as provided in said contract for said building; and to turn over said building fully completed to said Harrison Building Company, its successors or assigns, as provided in said contract: * * * In addition to the consideration above named for the making of the aforesaid stipulations, a further stipulation has been made, and which is hereby acknowledged, whereby W. H. Knauss and J. T. Gamble have for the Harrison Building Company secured or agreed to secure W. H. Ellis & Company in the payment of the balance of the money due on their contract for said building in addition to the amount of $140,000.00 stipulated as above." Was there a violation of the contract of July 27, 1903, by the owner? The rebates of $5,000 monthly (see the two agreements of W. H. Ellis & Co. and Joseph E. Blackburn, of November 14, 1901, and agreement of W. H. Ellis & Co. and Knauss & Gamble, of August 4, 1903) were to be deposited in the M. & M. Bank, and, when sufficient to pay an estimate, Knauss & Gamble were to give their check therefor on the M. & M. Bank, and with reference to the payment of Estimate 15, for $17,104.17, Kennedy, upon examination in chief, testified as follows:

"Mr. Gamble was present when I delivered the voucher to him. There was an agreement whereby a certain amount of money was to be deposited in the M. & M. Bank, and, when that money had accumulated to a sufficient amount to take care of his architect's estimate, that they were to give us their check on the M. & M. Bank, and, when this voucher was presented, I demanded that check, and the percentage which was to go to the owner on their original contract reduced the amount of this estimate to a trifle over $12,000—I can't recollect just the exact amount—and when this estimate was signed, receipted for by me, Knauss & Gamble gave their own individual check on the M. & M. Bank, and they agreed to hold this voucher as against Ellis & Co., to not collect it from the Columbus Savings Bank & Trust Company."

And upon cross-examination he testified as follows:

"Q. You spoke about a balance, I think about $5,000, that you didn't get, being something that was to go to them on the contract, that was a rebate that they were to receive on the Ellis & Co. contract?

"A. That was a rebate they were to receive on the original contract."

Mr. Huling's testimony as to what Gamble said about the $17,104.17 voucher being delivered to Knauss & Gamble to cover advances theretofore made is mere hearsay and cannot be considered. Gamble was not called to testify, and Knauss' recollection of the transaction was very indistinct.

It is not questioned but that Kennedy received the $12,104.17 as contemplated and provided for by the said agreements of W. H. Ellis & Co. and Joseph E. Blackburn and W. H. Ellis & Co. and Knauss & Gamble, nor can it be questioned that Knauss or the Harrison Building Company received the $17,104.17 out of the $140,000 set apart for W. H. Ellis & Co. It follows that the

Harrison Building Company wrongfully appropriated at least $12,104.17 of the moneys deposited in the Columbus Savings Bank & Trust Company.

But in the view which the court takes of the case it is not necessary to determine whether the wrongful appropriation by the Harrison Building Company of the $12,104.17 would release the waiver and restore to the contractor the right to a mechanic's lien.

(2) Did the contractor do extra work, and, if so, was it done in accordance with the requirements of the contract? The evidence bearing upon this point is found in the testimony of the witnesses Hannaford and Kennedy, and the account attached to the affidavit for a mechanic's lien filed by W. H. Ellis & Co. September 9, 1904. The weight of the evidence shows that the only extra work done was in making some changes in the partitions on the tenth floor, reducing the number of rooms provided for in the drawings under which the building was constructed. If this work is covered in the account by the items set forth under the head "Remodeling Tenth Floor," the cost thereof would be $45.31, and, if it covers the first seven pages of the account, less the first seven items of the first page, the two items of the fifth page for work on the second and twelfth floors, and the last five items on the sixth page for work done on the elevator shaft, the cost would amount to $873.71. The following items of the account do not represent work and labor done and material furnished for the construction of the building under the contract, and do not furnish the subject-matter of a mechanic's lien, namely: Fuel, water, and labor furnishing heat for tenants, $1000; damage to boiler since court issued injunction, $500; additional elevator pump, if required, and supplying one passenger with safe-lifting device, $1,500; mail chute, if ordered, $1,500; expense on account of injunction suit, $1,000; 15 per cent. profit for maintaining business, office rent, stenographers, liability insurance, bond, incidental, and traveling expenses, legal services, etc., $1,797.35; difference in cost of building between original drawings and specifications and the detail plans and specifications from which the building was constructed, $20,000; 10 per cent. profit, $3.377.97—making a total of $30.675.30.

But if extra work was done, little or much, it was not done in accordance with the requirements of the contract, which provides "that no deviation shall be made in the matter of compensation herein and no charges made or claim presented for extras or for any other matters claimed to be outside of the contract, plans and specifications, excepting that written agreement therefor be first signed and the said extra charges agreed to in writing by the said party of the first part, or his successors or assigns, and agreed to by the said second party's bondsmen." There was no written agreement between the parties authorizing the extra work or payment therefor, nor is there any evidence to show that the owner by any act or conduct on his or its part waived or is estopped from asserting the right to a strict performance of the contract in respect to extra work.

(3) Was the building completed, finally approved by the architect, and accepted by the owner, as required by the contract? The contract provides that "the final ten (10) per cent. of said purchase price, to wit, thirty thousand ($30,000.00) dollars, shall not be paid until after thirty days from the final completion of the building, final approval by the architect and acceptance by the said party of the first part."

Sprague, the receiver of W. H. Ellis & Co., claims that the building was completed May 19, 1904, but the report of the architect shows conclusively that it was not then completed. The evidence shows that the intervening subcontractors completed their work at the times following, namely: The Toledo Wire & Iron Works Company between the 10th and 15th of August, 1904; Samuel A. Esswein on June 21, 1904; the Electric Supply & Construction Company on August 17, 1904; and Thomas H. Winston on September 22, 1904. And the architect, Hannaford, testifies positively that the building never was completed and that the work never received his final approval, nor was it accepted by the owner.

Kennedy, in his cross-examination and in chief, testified positively that the building was completed within three weeks after the architect made his report on May 25th, which would fix June 16, 1904, as the time of completion,

but, as stated, the subcontractors did not finish their work until the latter part of June, and in August and September, and Hannaford testified that the work never was completed.

The mechanic's lien, therefore, claimed by the receiver of W. H. Ellis & Co. cannot be enforced.

### The Claims of the Subcontractors.

Under the mechanic's lien law of Ohio in force pending the construction of the building, subcontractors might acquire liens for labor performed and material furnished, not only upon the moneys due to the contractor from the owner, but also upon the building, and the subcontractors here have filed intervening petitions and set up such liens. Subcontractors Samuel A. Esswein, the Electric Supply & Construction Company, and Frank Powell, doing business under the name of the Toledo Wire & Iron Works Company, in compliance with the requirements of section 3184 and 3195 of the Revised Statutes of 1906 of Ohio, as amended April 18, 1902, obtained liens for labor and material not only upon the fund deposited with the Columbus Savings Bank & Trust Company, under contract of July 27, 1903, but also upon the building and the leasehold upon which it stands; and Subcontractor Thomas H. Winston, by compliance with the requirements of sections 3193, 3198, and 3201 of the Revised Statutes of 1908 of Ohio, as re-enacted April, 20, 1904, and approved by the Governor April 27, 1904, also obtained a lien for labor performed and material furnished upon said fund and upon said building and leasehold, and these liens are not affected by the failure of W. H. Ellis & Co. to complete their contract. Notice being given, these liens attached to the unpaid installments covered by the estimates of the architect of May 31, 1904, and June 16, 1904, the first being for $10,220.80 and the second for $20,011.09, payment of which to W. H. Ellis & Co. was withheld by the Harrison Building Company, as admitted by its counsel, because of such notice, and they also attached to the building and the leasehold upon the filing of a sworn copy with the county recorder of the statement or affidavit required by the statutes referred to. See Boisot on Mechanics' Liens, §§ 84, 85, and the cases there cited.

The liens of Esswein and the Electric Supply & Construction Company have priority over the mortgage of the complainant, the Provident Savings Bank & Trust Company. The lien of the mortgage became effective on June 6, 1903, when the bonds were issued to W. P. Harrison. Reynolds v. Manhattan, 83 Fed. 593, 599, 27 C. C. A. 620. But the liens of Esswine and the Electric Supply & Construction Company "date back from the date of the furnishing of the first item of labor." Section 3185, Rev. St. Ohio 1906; 95 Ohio Laws, p. 210. The first item of labor was furnished by Esswine June 20, 1902, and by the Electric Supply & Construction Company April 25, 1903. The liens of Powell and Winston, however, do not antedate the issue of the bonds, but the Harrison Building Company wrongfully appropriated at least $12,104.17 of the fund deposited with the Columbus Savings Bank & Trust Company, which it now holds as a trustee ex maleficio, for the beneficiaries of that fund, whose equity therein is superior to the claim of W. P. Harrison, who is not only the holder of the bonds, but since March 18, 1902, has been the beneficial owner of the building and leasehold, and who personally received secret rebates upon each voucher paid by him to W. H. Ellis & Co. upon the architect's estimates from July 29, 1902, to May 25, 1903, to the amount of $23,649.24.

Blackburn and W. H. Ellis & Co. for their mutual profit devised a scheme for the erection of the building set forth in the two written contracts between them of November 14, 1901. They were not capitalists, and the scheme contemplated the transfer of Blackburn's interest to a corporation to be organized, or to some person able to finance it, and through Moling they found Harrison, to whom the contracts were assigned. By an agreement between Harrison and Moling, in consideration of Moling's services in procuring the transfer of Blackburn's interest in the two contracts of November 14, 1901, and other contracts, and of his undertaking to sell all the bonds of a company to be afterwards organized as the Harrison Building Company, Harrison agreed to turn over to Moling one-third of all the net profits or assets of said

company, whether it should be in stocks, bonds, moneys, real estate, or other securities, and Moling thereupon transferred to Blackburn a one-half interest in said net profits, and in this manner Blackburn was paid for his interest in the two contracts of November 14, 1901. This transaction demonstrated that in Harrison Blackburn and W. H. Ellis & Co., through Moling, had found an able financier, for, as a result of the transaction, Blackburn got one-half of one-third of the prospective net profits of the Harrison Building Company, Moling got from W. H. Ellis & Co. $5,000 in money, and Harrison got a fund of $60,000, to be received by him in rebates upon each voucher paid by him to W. H. Ellis & Co. Afterwards Harrison on behalf of the company borrowed $190,000 from the Columbus Savings Bank & Trust Company, upon the pledge of the bonds to the amount of $115,000, issued to him for moneys advanced for the construction of the building, and treasury bonds to the amount of $175,000. Of this loan $140,000 was deposited with the Columbus Savings Bank & Trust Company, to be paid to W. H. Ellis & Co. for the completion of the building, upon the terms and conditions set forth in the written agreement of July 27, 1903. When the loan matured, to prevent a sacrifice of the collateral (his own bonds and the treasury bonds), Harrison bought it in for $190,714.45, and, upon the sale of the property, under the mortgage, Harrison, through his attorney Fritter, bought it in for $150,000, and upon application to this court had it conveyed by the United States marshal to the Harrison Company, a new corporation organized for that purpose. From the beginning he practically owned and controlled the property under cover of a corporate organization, and, if necessary for the payment of the claims of the subcontractors in full, resort might be had to his interest in the proceeds of the sale to the extent of the rebates received by him to the prejudice and in fraud of the rights of the subcontractors.

It is not questioned that the work of the subcontractors was completed as set forth in their intervening petitions, nor that of the fund set apart for the completion of the building there remains on deposit in the Columbus Savings Bank & Trust Company $19,817.60, but, as that fund is not subject to the control of this court, it will direct that the proceeds of the sale of the property, after the payment of costs, be applied first to the payment of the claims of Samuel A. Esswein and the Electric Supply & Construction Company in full and their costs; second, to the payment of the claims of Thomas H. Winston and Frank Powell, and their costs, not exceeding, however, the sum of $12,104.17; the remainder of said proceeds to be distributed as the court shall hereafter order.

Question has been made by counsel for the Harrison Building Company as to whether Winston filed with the owner notice of his claim, as required by section 3193, and counsel for Winston advises the court that at the hearing he offered to call Judge Sater to prove that he had served such notice, as the attorney of Winston, and that opposing counsel then accepted the statement of counsel for Winston that such notice had been duly given. If, however, counsel for the Harrison Building Company still insist that such notice was not given, the court will permit Judge Sater to testify as to what the fact is, and will hear any evidence which may be offered by the Harrison Building Company upon that point.